**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF COLORADO**

| | |
|---|---|
| CHILDREN'S HOSPITAL COLORADO, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-02561-NYW |
| U.S. DEPARTMENT OF DEFENSE and LLOYD AUSTIN III, in his official capacity as Secretary of Defense, U.S. Department of Defense., | |
| Defendants. | |

**DEFENDANTS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

I.    STATUTORY AND REGULATORY BACKGROUND ...........................................3

    A.    The TRICARE Program ...............................................................................3

    B.    The Statutory And Regulatory Framework Determining TRICARE Payment
        Amounts To Providers .................................................................................5

    C.    The Challenged Rule ....................................................................................9

II.    FACTUAL BACKGROUND ...................................................................................12

III.    THIS LITIGATION ................................................................................................13

LEGAL STANDARDS ......................................................................................................13

ARGUMENT ......................................................................................................................15

I.    THE FINAL RULE IS LAWFUL ...........................................................................15

    A.    The Final Rule Is Neither In Excess Of DoD's Statutory Authority Nor
        Contrary To Law. ........................................................................................15

    B.    The Final Rule Is Not Arbitrary, Capricious, Or An Abuse Of Discretion. ...............20

        1.    DoD Adequately Explained The Final Rule. ......................................20

        2.    DoD Adequately Considered The Relevant Issues. ............................22

        3.    The Final Rule Is Consistent With DoD's Reasoning. ......................25

        4.    DoD Adequately Responded To Comments Received In The
            Rulemaking Process. .................................................................27

        5.    DoD Did Not Arbitrarily Change Agency Practice. ...........................28

II.    PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE
    DENIED. .................................................................................................................29

        1.    Plaintiff Cannot Establish Irreparable Harm. ...................................30

        2.    The Balance Of The Equities And Public Interest Do Not Support
            Injunctive Relief. .....................................................................31

III.     ANY RELIEF SHOULD BE APPROPRIATELY LIMITED TO THIS
         PLAINTIFF...................................................................................................................32

CONCLUSION...............................................................................................................................33

# TABLE OF AUTHORITIES

## CASES

*Almendarez-Torres v. United States,*
 523 U.S. 224 (1998) ......................................................................................................16

*Am. Petroleum Inst. v. U. S. Dep't of Interior,*
 81 F.4th 1048 (10th Cir. 2023) ..........................................................................24, 27, 29

*Barker v. United States,*
 404 F. Supp. 3d 251 (D.D.C. 2019) ...............................................................................21

*Bates v. United States,*
 522 U.S. 23 (1997) ........................................................................................................19

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC,*
 562 F.3d 1067 (10th Cir. 2009) .....................................................................................14

*Benisek v. Lamone,*
 138 S. Ct. 1942 (2018) ...................................................................................................30

*Bhd. of R.R. Trainmen v. Balt.e & Ohio R.R. Co.,*
 331 U.S. 519 (1947) ......................................................................................................16

*Bradford v. U.S. Dep't of Lab.,*
 582 F. Supp. 3d 819 (D. Colo. 2022) .............................................................................29

*Catskill Mountains Ch. of Trout Unlimited, Inc. v. Env't Prot. Agency,*
 846 F.3d 492 (2d Cir. 2017) .................................................................................... 17, 19

*Cement Kiln Recycling Coal. v. Env't Prot. Agency,*
 493 F.3d 207 (D.C. Cir. 2007) .......................................................................................28

*Cherokee Nation v. Bernhardt,*
 936 F.3d 1142 (10th Cir. 2019) .....................................................................................14

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
 467 U.S. 837 (1984) ......................................................................................................13

*City of Colorado Springs v. Chao,*
 587 F. Supp. 2d 1185 (D. Colo. 2008),
 *aff'd sub nom. City of Colorado Springs v. Solis,* 589 F.3d 1121 (10th Cir. 2009) .....................................21

*Clark v. Rameker,*
 573 U.S. 122 (2014) ......................................................................................................19

*Colorado Wild, Heartwood v. U.S. Forest Serv.*,
    435 F.3d 1204 (10th Cir. 2006)...............................................................................28

*Corley v. United States*,
    556 U.S. 303 (2009)...............................................................................................19

*Cuozzo Speed Techs., LLC v. Lee*,
    579 U.S. 261 (2016)...............................................................................................17

*Del. Dep't of Nat. Res. & Env't Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015)...................................................................................28

*Department of Homeland Security v. New York*,
    140 S. Ct. 599 (2020)............................................................................................33

*Department of Homeland Security v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020)..........................................................................................24

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)...............................................................................................28

*F.C.C. v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021)..........................................................................................14

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018)..........................................................................................32

*Hays Med. Ctr. v. Azar*,
    956 F.3d 1247 (10th Cir. 2020)............................................................................14

*Heal Utah v. U. S. Env't Prot. Agency*,
    77 F.4th 1275 (10th Cir. 2023) .............................................................................27

*Heideman v. S. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003)......................................................................30, 31

*Holmberg v. Armbrecht*,
    327 U.S. 392 (1946)...............................................................................................30

*K Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988)...............................................................................................33

*King v. Burwell*,
    576 U.S. 473 (2015)...............................................................................................19

*Kingdomware Techs., Inc. v. United States*,
    579 U.S. 162 (2016)...............................................................................................17

*Maracich v. Spears*,
   570 U.S. 48 (2013) ....................................................................................................16

*McBride v. Bank of Am.*,
   No. 2:10-CV-960, 2012 WL 202619 (D. Utah Jan. 23, 2012) .............................29

*Merrell v. Allred*,
   No. 11-cv-02291-REB-MJW, 2013 WL 1365767 (D. Colo. Apr. 4, 2013),
   *aff'd*, 501 F. App'x 783 (10th Cir. 2012) .........................................................29

*Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...................................................................................................21

*Mt. Diablo Hosp. v. Shalala*,
   3 F.3d 1226 (9th Cir. 1993) ....................................................................................27

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) .................................................................................................21

*Nat'l Auto. Dealers Ass'n v. Fed. Trade Comm'n*,
   864 F. Supp. 2d 65 (D.D.C. 2012) ................................................................... 17, 19

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) .................................................................................................13

*Nat'l Wildlife Fed'n v. Norton*,
   306 F. Supp. 2d 920 (E.D. Cal. 2004) ...................................................................23

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
   565 F.3d 683 (10th Cir. 2009) ................................................................................24

*New Mexico Health Connections v. United States Dep't of Health & Hum. Servs.*,
   946 F.3d 1138 (10th Cir. 2019) ..............................................................................24

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................................31

*Pauley v. Bethenergy Mines, Inc.*,
   501 U.S. 680 (1991) .................................................................................................13

*Pub. Citizen, Inc. v. FAA*,
   988 F.2d 186 (D.C. Cir. 1993) ................................................................................28

*RoDa Drilling Co. v. Segal*,
   552 F.3d 1203 (10th Cir. 2009) ..............................................................................31

*Rostker v. Goldberg*,
   453 U.S. 57 (1981) ...................................................................................................14

*Russello v. United States,*
    464 U.S. 16 (1983) ...................................................................................................19

*S. Ute Indian Tribe v. U.S. Dep't of the Interior,*
    No. 15-cv-01303, 2015 WL 3862534 (D. Colo. June 22, 2015) ................................ 30, 31

*San Juan Citizens All. v. Stiles,*
    654 F.3d 1038 (10th Cir. 2011)..................................................................................23

*Schrier v. Univ. Of Co.,*
    427 F.3d 1253 (10th Cir. 2005)..................................................................................30

*Southwest Airlines Co. v. Saxon,*
    596 U.S. 450 (2022)...................................................................................................16

*Thomas Jefferson Univ. Hosp. v. Shalala,*
    512 U.S. 504 (1994)...................................................................................................13

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018)...............................................................................................33

*United States v. Turkette,*
    452 U.S. 576 (1981) ............................................................................................ 18, 23

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981)...................................................................................................30

*Vega v. Wiley,*
    259 F. App'x 104 (10th Cir. 2007) ............................................................................30

*Villarreal-Dancy v. U. S. Dep't of the Air Force,*
    633 F. Supp. 3d 19 (D.D.C. 2022)............................................................................15

*W. Watersheds Project v. Bureau of Land Mgmt.,*
    721 F.3d 1264 (10th Cir. 2013)..................................................................................14

*Wages & White Lion Invests., L.L.C. v. United States Food & Drug Admin.,*
    16 F.4th 1130 (5th Cir. 2021)....................................................................................24

*Westar Energy, Inc. v. Lake,*
    552 F.3d 1215 (10th Cir. 2009)..................................................................................30

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .........................................................................................14, 29, 31

*Wolfe v. Barnhart,*
    446 F.3d 1096 (10th Cir. 2006)..................................................................................14

*Yates v. United States,*
    574 U.S. 528 (2015) ....................................................................................16

## **STATUTES**

5 U.S.C. § 551 ..............................................................................................2

5 U.S.C. § 706(2) .................................................................................. 14, 33

10 U.S.C. § 1071 ..........................................................................................3

10 U.S.C. § 1072(3) ...................................................................................18

10 U.S.C. § 1073(a) .......................................................................... 4, 5, 6, 18

10 U.S.C. § 1075 ..........................................................................................4

10 U.S.C. § 1075a .........................................................................................4

10 U.S.C. § 1079(a) ............................................................................ 5, 15, 25

10 U.S.C. § 1079(h)(1) ......................................................................... 7, 18

10 U.S.C. § 1079(i)(2) ..........................................................................*passim*

10 U.S.C. § 1079(j)(2) (2001) .....................................................................6

10 U.S.C. § 1086(a) .....................................................................................5

10 U.S.C. § 1097b(a)(3) ...............................................................................5

10 U.S.C. § 1106(b) ...................................................................................31

10 U.S.C. § 2302 ..........................................................................................5

10 U.S.C. § 9013(f) .....................................................................................15

42 U.S.C. § 419.70(d)(3) ............................................................................17

42 U.S.C. § 1395l(t)(7)(D)(ii) .....................................................................17

Dependents' Medical Care Act,
Pub. L. No. 569, 70 Stat. 250 (1956)
    (now codified as amended at 10 U.S.C. §§ 1071–1110b) .....................3, 4, 15, 16

Military Medical Benefits Amendments of 1966,
    Pub. L. No. 89-614, 80 Stat. 862 (1966) ...............................................4

National Defense Authorization Act for Fiscal Year 1994,
    Pub. L. No. 103-160, 107 Stat. 1696 (1993).   ........................................4

National Defense Authorization Act for Fiscal Year 2002,
Pub. L. No. 107-107, 115 Stat. 1012 (2001) .................................................................6, 7, 16, 28

National Defense Authorization Act for Fiscal Year 2015,
Pub. L. No. 113-291, 128 Stat. 3292 (2014) .................................................................6

National Defense Authorization Act for Fiscal Year 2017,
Pub. L. No. 114-328, 130 Stat. 2000 (2016) .................................................................4

**LEGISLATIVE HISTORY**

H.R. CONF. REP. NO. 107-333 (2001).................................................................7

**RULES**

D.C. Colo. LAPR 16.1(c).................................................................3

**REGULATIONS & FEDERAL REGISTER NOTICES**

32 C.F.R. § 199.................................................................5

32 C.F.R. § 199.1(f).................................................................5

32 C.F.R. § 199.2(b).................................................................5, 22

32 C.F.R. § 199.4(e)(10).................................................................25

32 C.F.R. § 199.6(a)(8)(i)(A).................................................................5

32 C.F.R. § 199.7(d).................................................................31

32 C.F.R. § 199.14.................................................................6, 11, 25, 26

32 C.F.R. § 199.17.................................................................4, 22

32 C.F.R. § 199.18.................................................................4

42 C.F.R. § 419.70(d)(3).................................................................17

"Civilian Health and Medical Program of the Uniformed Services ('CHAMPUS'); TRICARE
Program; Uniform HMO Benefit; Special Health Care Delivery Programs,"
60 Fed. Reg. 52,078 (October 5, 1995) (adding 32 C.F.R. §§ 199.17-18) ...........................4

"Medicare Program; Prospective Payment System for Hospital Outpatient Services,"
63 Fed. Reg. 47,552 (Sep. 8, 1998).................................................................8

"TRICARE; Hospital Outpatient Prospective Payment System (OPPS),"
73 Fed. Reg. 74,945 (Dec. 10, 2008).................................................................8, 9

"TRICARE; Reimbursement of Ambulatory Surgery Centers and Outpatient Services
Provided in Cancer and Children's Hospitals,"
84 Fed. Reg. 65,718 (Nov. 29, 2019) .......................................................................................... 9

"TRICARE; Reimbursement of Ambulatory Surgery Centers and Outpatient Services
Provided in Cancer and Children's Hospitals,"
88 Fed. Reg. 19,844 (Apr. 4, 2023) ................................................................................ 9, 10, 11

"TRICARE; Sub-Acute Care Program; Uniform Skilled Nursing Facility Benefit;
Home Health Care Benefit; Adopting Medicare Payment Methods
for Skilled Nursing Facilities and Home Health Care Providers,"
67 Fed. Reg. 40,597 (June 13, 2002) ................................................................................ 7, 8, 28

## OTHER AUTHORITIES

Centers for Medicare & Medicaid Services, "National Health Expenditure Data Fact Sheet,"
*available at*: https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/nhe-fact-sheet

Defense Health Agency, "About MHS,"
*available at*: https://www.health.mil/About-MHS/OASDHA/Defense-Health-Agency ..............17

*Practicable*, BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................................19

## INTRODUCTION

Congress created the TRICARE health care system to provide health services for active-duty and certain retired members of the uniformed services, as well as their dependents.   Congress granted broad discretion to the Secretary of the United States Department of the Defense (DoD) to implement this health care system and to provide access to covered care for TRICARE beneficiaries.[1]   But that discretion must be exercised within the statutory framework that Congress provided.   Specifically, in the National Defense Authorization Act of Fiscal Year 2002 (FY02 NDAA), Congress sought to limit the reimbursement amounts that TRICARE paid health care providers for medical services provided to TRICARE beneficiaries.   Congress accomplished this goal by directing DoD to adopt reimbursement rules for institutional providers, such as hospitals, that align "to the extent practicable" with Medicare's reimbursement rules for determining payments to institutional providers of the same type of services.  10 U.S.C. § 1079(i)(2).

At that time, however, Medicare was in the middle of its own transition to a new method for calculating the amount that hospitals should receive for the provision of hospital outpatient services. Accordingly, while DoD expressly stated that it intended to later adopt Medicare's new reimbursement rules for such services, it would do so gradually.   In 2008, DoD first adopted Medicare's reimbursement rules for many hospital outpatient services, while exempting temporarily the services provided by cancer and children's hospitals.   DoD justified this exemption by reference to the administrative complexity of calculating payments intended to ensure that cancer and children's hospitals would receive appropriate payments under the Medicare reimbursement rules.

DoD's gradual adoption of the Medicare reimbursement rules continued with the rule at issue here.  Following a notice of proposed rulemaking in 2019 and a considered rulemaking process, DoD

---

[1] The Secretary established the Defense Health Agency (DHA) in 2013, and subsequently delegated authority to the Director of the DHA to manage and administer the TRICARE program.  Accordingly, this memorandum refers to DoD and DHA interchangeably.

issued in April 2023 the final rule that Plaintiff challenges. That final rule implements the statutory mandate requiring that TRICARE's reimbursement rules track those of Medicare by adopting the Medicare reimbursement rules for cancer and children's hospitals with minor modifications to account for the fact that TRICARE serves a different beneficiary base and is administered by a different agency.

Plaintiff takes issue with the fact that the new reimbursement rule will, as Congress intended, limit the amounts paid for the hospital outpatient services that hospitals such as Plaintiff provide to TRICARE beneficiaries. In an effort to maintain the windfall payments it receives from DoD well in excess of the costs that Plaintiff incurs to provide the covered services, Plaintiff asserts two claims challenging the final rule under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.* Neither challenge has merit.

*First*, Plaintiff asserts that the final rule exceeds DoD's statutory authority or is contrary to law because the final rule adopts modified versions of Medicare's reimbursement rules in a way that Plaintiff claims will reduce access to health care. But no provision in the TRICARE statutory scheme prohibits modifications to Medicare's reimbursement rules. To the contrary, the statute expressly contemplates that DoD, which is a different agency administering a different program for a different beneficiary base, would modify Medicare's reimbursement rules to accommodate practicability considerations. Indeed, the statute grants the Secretary broad discretion to do so. That Plaintiff disagrees with the exercise of the Secretary's discretion on policy grounds is not a basis under the APA to conclude that the Secretary exceeded his authority.

*Second*, Plaintiff argues that the final rule is arbitrary and capricious under the APA even if legally authorized by the TRICARE statutory scheme. But DoD carefully considered the very issue at the core of Plaintiff's lawsuit—that lower rates would financially harm certain children's hospitals and therefore potentially decrease access to service—both before issuing the notice of proposed

rulemaking and during the rulemaking process.  To address this concern, DoD enacted hold-harmless payments to ensure cancer and children's hospitals are paid the full costs they incur in providing covered services to TRICARE beneficiaries and offered supplemental discretionary payments so that eligible hospitals could receive up to 115% of those hospitals' costs to ensure continued access to medical services for TRICARE beneficiaries.  The administrative record thus reflects a considered rulemaking process that resulted in an adequately justified final rule.

Finally, this Court need not reach Plaintiff's motion for a preliminary injunction because it can resolve the entire action on Defendants' motion for judgment on the administrative record.[2]  But even if Plaintiff's claims survive, they do not warrant preliminary relief given Plaintiff's delay in challenging the regulation and the administrative and economic harm to the DoD and other hospitals that preliminary relief would cause.

For these reasons, the Court should grant Defendants' motion for judgment on the administrative record and should deny Plaintiff's motion for a preliminary injunction.

## BACKGROUND

## I.     STATUTORY AND REGULATORY BACKGROUND

### A.  The TRICARE Program

In 1956, Congress established a health care system, now known as TRICARE, for active-duty and certain retired members of the uniformed services, as well as their dependents.  Dependents' Medical Care Act, Pub. L. No. 569, 70 Stat. 250 (1956) (now codified as amended at 10 U.S.C. §§ 1071–1110b).  Congress intended TRICARE to "create and maintain high morale in the uniformed services by providing an improved and uniform program of medical and dental care for members and certain former members of those services, and for their dependents."  10 U.S.C. § 1071.  As originally enacted, dependent and retiree health care was available primarily at military medical treatment

---

[2] Whether characterized as a motion for judgment on the administrative record pursuant to D.C. Colo. LAPR 16.1(c), or a motion for summary judgment pursuant to this Court's scheduling order, ECF No. 20, the legal analysis and outcome is the same.

facilities run by the uniformed services, with limited entitlement to hospitalization and related care in the private sector when such care was not available at uniformed services facilities.  Pub. L. No. 569, Title II, §§ 201-204.  In 1966, Congress amended the program to expand coverage of private sector care as a supplement to the direct care medical system.  Military Medical Benefits Amendments of 1966, Pub. L. No. 89-614, 80 Stat. 862 (1966).  The expanded private sector component of the military health care system used contractors to administer the private sector program and to process claims for covered services provided to eligible beneficiaries.

In 1993, Congress directed DoD to implement a health benefit option modeled after health maintenance organization (HMO) plans offered in the private sector.  National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 731, 107 Stat. 1696 (1993).  The Department implemented this requirement through issuance of a final rule, "Civilian Health and Medical Program of the Uniformed Services ('CHAMPUS'); TRICARE Program; Uniform HMO Benefit; Special Health Care Delivery Programs," 60 Fed. Reg. 52,078 (October 5, 1995) (adding 32 C.F.R. §§ 199.17-18).  That rule established the "TRICARE program" as a comprehensive managed health care program.  The TRICARE program offered beneficiaries enrollment options to obtain coverage for health care from civilian providers, and sought to "reduce[] beneficiaries' out-of-pocket costs for civilian sector care."  60 Fed. Reg. at 52,079.

Beneficiaries' enrollment options were expanded in 2017 by Congress through the National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat. 2000, 2969 (2016).  That Act added 10 U.S.C. § 1075 to establish TRICARE Select as a self-managed preferred provider option (PPO).  It also added 10 U.S.C. § 1075a to continue TRICARE Prime as a health plan option.  That Act required that both TRICARE Prime and TRICARE Select use a new health care enrollment system, which includes a mandatory enrollment to maintain private sector coverage and an open season enrollment period.  In addition, both programs now have specified categories of health care services (such as primary care, specialty care, or emergency care) with new statutory cost-shares based on the category of care and whether the source of care is from a network or non-network provider.

The Secretary of Defense is responsible for administering the TRICARE program and making any decision affecting it. 10 U.S.C. § 1073(a)(2). In 2013, the Secretary established DHA and delegated authority to the Director of DHA to manage and administer the TRICARE program.[3] To fulfill its statutory obligation, DoD has promulgated regulations and manuals that govern all aspects of the TRICARE program. *See id.* § 1073(a); *see generally* 32 C.F.R. § 199. The Secretary has the sole authority to administer TRICARE to ensure beneficiary access to covered care and the processing of claims for such care furnished in the private sector. 10 U.S.C. §§ 1079(a), 1086(a). The Secretary exercises that authority in accordance with the Armed Services Procurement Act, 10 U.S.C. § 2302, *et. seq.*, the Federal Acquisition Regulation (FAR), and the Department of Defense Federal Acquisition Regulation Supplement (DFARS). *See* 32 C.F.R. § 199.1(f). The Secretary administers the TRICARE program through the procurement of Managed Care Support Contracts for, among other matters, the establishment, management, or maintenance of a network of providers and the processing of claims for covered private sector care. 10 U.S.C. § 1097b(a)(3).

### B. The Statutory And Regulatory Framework Determining TRICARE Payment Amounts To Providers

TRICARE allows payment directly to healthcare providers for the provision of covered services when the provider is a "participating provider" as defined in 32 C.F.R. § 199.2(b). To qualify as a "participating provider," the provider must agree to accept the allowed amount specified by regulation as "the maximum total charge for a service or item rendered to a … beneficiary[.]" *Id.* Hospitals, as TRICARE authorized institutions, are required to be participating providers on all claims in order to seek reimbursement directly from TRICARE. 32 C.F.R. § 199.6(a)(8)(i)(A).

Not all functions that a hospital performs qualify as covered services for which payment can be obtained under TRICARE. Specifically, the statute states that "[a] service or supply which is not medically or psychologically necessary to prevent, diagnose, or treat a mental or physical illness, injury, or bodily malfunction as assessed or diagnosed by" a statutorily-enumerated healthcare professional

---

[3] DHA was established by DoD Directive 5136.13, effective October 1, 2013, and replaced the TRICARE Management Activity (TMA). The DHA mission includes managing TRICARE.

"may not be provided."  10 U.S.C. § 1079(a)(12).  A narrow exception exists for Christian Science providers not otherwise qualified as healthcare professionals under Section 1079(a)(4).  Accordingly, providers such as hospitals obtain payment under TRICARE only for services or supplies that prevent, diagnose, or treat medical conditions; hospitals do not obtain payment for functions such as research and community outreach.

The amounts to be paid by TRICARE to providers for medical services to TRICARE's covered beneficiaries are determined by DoD regulations.  32 C.F.R. § 199.14 (specifying provider reimbursement methods).  Those regulations have changed over time to track the Congressional mandate that those regulations implement.  Prior to 2002, DoD had broad discretion to issue regulations to establish the amounts to be paid to institutional providers of medical services to covered beneficiaries under TRICARE.  The statute in relevant part read:

> The amount to be paid to a provider of services for services provided under a plan covered by this section *may be determined* under joint regulations to be prescribed by the administering Secretaries[4] which provide that the amount of such payments shall be determined to the extent practicable in accordance with the same reimbursement rules as apply to payments to providers of services of the same type under [Medicare].

10 U.S.C. § 1079(j)(2)(A) (2001) (emphasis added).[5]  Critically, the statute did not mandate that the Secretary issue regulations requiring that providers be paid in accordance with the Medicare's reimbursement rules.  Instead, Congress stated only that those payment amounts "may be determined" under regulations that track Medicare's reimbursement rules for providers of services of the same type.

---

[4] The statute defines "administering secretaries" to be the Secretary of Defense (for the armed forces), the Secretary of Homeland Security (for the Coast Guard when the Coast Guard is not operating as a service in the Navy), and the Secretary of Health and Human Services (for the National Oceanic Atmospheric Administration and Public Health Service).  10 U.S.C. § 1073(a)(1).  Section 1073(a)(2) specifies that the Secretary of Defense has responsibility for "administering the TRICARE program and making any decision affecting such program" unless "otherwise provided in this chapter."

[5]  Section 1079(j)(2) was redesignated as Section 1079(i)(2) in 2014.  *See* National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 703(a)(3), 128 Stat. 3292 (2014).  Accordingly, what in 2001 was Section 1079(j)(2) is the appropriate predecessor of what is now Section 1079(i)(2), the statutory provision at issue in this action.

In 2002, Congress narrowed the Secretary's discretion to determine payment amounts in the National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, 115 Stat. 1012 (2001) (FY02 NDAA).  Through FY02 NDAA, Congress mandated that the Secretary issue regulations to determine payment amounts, where practicable, using Medicare's reimbursement rules:

> The amount to be paid to a provider of services for services provided under a plan covered by this section *shall be determined* under joint regulations to be prescribed by the administering Secretaries which provide that the amount of such payments shall be determined to the extent practicable in accordance with the same reimbursement rules as apply to payments to providers of services of the same type under title XVIII of the Social Security Act

10 U.S.C. § 1079(i)(2).  That language remains in effect today.[6]

This change was intended to enact "TRICARE program limitations on payment rates for institutional health care providers" by "expedit[ing] adoption of Medicare's prospective payments rates for … outpatient services."  H.R. CONF. REP. NO. 107-333, at 682 (2001).  Indeed, Congress titled the relevant section of the section FY02 NDAA as "TRICARE Program Limitations on Payment Rates for Institutional Health Care Providers …."  *See* FY02 NDAA § 707.

 On June 13, 2002, DoD issued an interim final rule in response to the statutory mandate of FY02 NDAA.  *See* "TRICARE; Sub-Acute Care Program; Uniform Skilled Nursing Facility Benefit; Home Health Care Benefit; Adopting Medicare Payment Methods for Skilled Nursing Facilities and Home Health Care Providers," 67 Fed. Reg. 40,597 (June 13, 2002).  The interim final rule adopted Medicare's prospective payment system for skilled nursing facility services and home health care services.  *Id.* at 40,599-600.  The interim final rule did not, however, adopt Medicare's payment rules

---

[6] Notably, Section 1079(i)(2) applies only to institutional providers, such as hospitals.  Payment for services by "an individual health care professional (or other noninstitutional health care provider) for which a claim is submitted under a plan contracted for under subsection (a) shall be equal to an amount determined to be appropriate, to the extent practicable, in accordance with the same reimbursement rules as apply to payments for similar services under [Medicare]."  10 U.S.C. § 1079(h)(1).  In other words, while Congress mandated that the methodology used to determine payments for institutional providers track, where practicable, the methodology used to determine payments for institutional providers of similar services under Medicare, Congress bypassed the question of methodology entirely as to noninstitutional providers.  Instead, Congress directed that those providers be paid amounts equal to those paid under Medicare, to the extent practicable.

for hospital outpatient services[7] because Medicare was simultaneously phasing in a new payment methodology—Outpatient Prospective Payment System (OPPS)—for that category of services. OPPS is a payment system for providers of outpatient services in which the amounts paid are predetermined, fixed amounts derived from a classification system for that service.  *See, generally*, "Medicare Program; Prospective Payment System for Hospital Outpatient Services," 63 Fed. Reg. 47,552 (Sep. 8, 1998).  OPPS replaced a system in which Medicare payment for hospital outpatient services "was based on hospital-specific reasonable costs."  *Id.* at 47,553.

During the period in which Medicare OPPS was "being phased in," Medicare was paying "a series of transitional payment adjustments that [we]re based partly upon the prior Medicare cost reports and Medicare's prior cost-based methodology."  67 Fed. Reg. at 40,601.  Attempting to incorporate those transitional payments created significant "complexities" for TRICARE given the "lack of TRICARE cost report data" at that time.  *Id.*  Accordingly, the TRICARE interim final rule concluded that it was not "practicable" for DoD "to adopt … OPPS for hospital outpatient services at this time."  *Id.*  The interim final rule made clear that this departure from the Medicare payment methodology for hospital outpatient services was temporary.  DoD explained that "[c]onsistent with the TRICARE payment reform statutory authority and general policy, [it] plan[s] to follow the Medicare approach" and "anticipate[s] eventual adoption of the Medicare OPPS for most TRICARE hospital outpatient services covered by the Medicare OPPS."  *Id.*

That process was a gradual one.  On December 10, 2008, DoD issued a final rule adopting the Medicare OPPS payment methodology for hospital outpatient services to TRICARE beneficiaries in general hospitals.  *See* "TRICARE; Hospital Outpatient Prospective Payment System (OPPS)", 73 Fed. Reg. 74,945 (Dec. 10, 2008).  This methodology did not apply to cancer and children's hospitals because DoD concluded it would not be practicable at that time for DoD to calculate the transitional outpatient payments (TOPS) that were made if the payments received under OPPS were less than the

---

[7]  Hospital outpatient services refer to "nonphysician services" such as facility services that hospitals provide to outpatients.  *See, generally*, "Medicare Program; Prospective Payment System for Hospital Outpatient Services," 63 Fed. Reg. 47,552, 47,55-556 (Sep. 8, 1998).  Outpatients are beneficiaries who have not been admitted to the hospital, but nonetheless receive treatment at a hospital facility.

payments received under the prior payment system.  *Id.* at 74,948-949 (noting the "administrative complexity of capturing the data required for payment of monthly interim TOP amounts"). Accordingly, DoD determined that TRICARE at that time would "continue to reimburse cancer and children's hospitals on a fee-for-services basis using billed charges and [maximum allowable charge amounts]."  *Id.* at 74,949.  Children's and cancer hospitals therefore continued to receive their full billed amounts.

### C.  The Challenged Rule

On November 29, 2019, DoD issued a notice of proposed rulemaking in which DoD proposed adopting Medicare's payment methodology for outpatient services provided by cancer and children's hospitals.  "TRICARE; Reimbursement of Ambulatory Surgery Centers and Outpatient Services Provided in Cancer and Children's Hospitals," 84 Fed. Reg. 65,718 (Nov. 29, 2019) (Administrative Record ("AR") at 1).[8]  DoD proposed to adopt that methodology so as to implement the "statutory requirement that payments for TRICARE institutional services" be determined to the extent practicable in accordance with the same reimbursement rules as under Medicare.  *Id.*  While DoD recognized that it had previously concluded the Medicare methodology (OPPS) was not practicable for cancer and children's hospitals because of the administrative burden in paying transitional hold-harmless payments, it determined that DHA "now has the capability, and it is feasible, to adopt these reimbursement provisions with a modification that the hold-harmless provisions will be calculated annually, rather than in monthly interim payments" under Medicare.  *Id.* The notice of proposed rulemaking emphasized that cancer and children's hospitals would "be held harmless under this proposed reimbursement system" because they would "receive, at a minimum, one hundred percent of their costs, or the OPPS payment, whichever is higher."  AR2.

Following a 60-day comment period and subsequent consideration, the final rule was adopted on April 4, 2023.  *See* "TRICARE; Reimbursement of Ambulatory Surgery Centers and Outpatient

---

[8] The challenged final rule also adopts Medicare's reimbursement rules for ambulatory surgery centers. *See* AR14.  Because Plaintiff does not challenge or seek relief as to that component of the final rule, this motion focuses on the component of the final rule adopting Medicare's reimbursement rules for cancer and children's hospitals.

Services Provided in Cancer and Children's Hospitals," 88 Fed. Reg. 19,844 (Apr. 4, 2023) (AR14). The final rule closely tracked the proposed rule as to cancer and children's hospital, adopting Medicare's reimbursement provisions for those providers with two modifications: (1) "that the hold-harmless provisions will be calculated annually, rather than in monthly interim payments," as signaled in the notice of proposed rulemaking; and (2) "that the agency will use the hospital's cost-to-charge ratio (CCR) rather than the payment-to-cost ratio." *Id.* at 19,848 (AR18).

The cost-to-charge ratio or CCR is derived from the hospital's costs incurred divided by the billed amount charged by the hospital. DHA's use of this ratio departs from Medicare's reimbursement rules for cancer and children's hospital outpatient services because Medicare's rules use a payment-to-cost ratio or PCR. *See* AR107-08. PCR is a hospital-specific figure derived from the amount a hospital was paid under Medicare's pre-OPPS payment methodology divided by the costs the hospital incurred. *Id.* The different ratios serve different purposes. While PCR is used by Medicare to hold hospitals harmless relative to the payments they would have received before OPPS was implemented, CCR is used by DHA to hold hospitals harmless relative to the costs they incurred to provide the covered services. TRICARE elected not to use PCR to calculate the hold-harmless payments because: (1) PCR used by Medicare relies on 1996 Medicare cost report data that would not reflect the services provided to TRICARE patients; (2) PCR used by Medicare reflects amounts paid by Medicare before adopting the OPPS system, and therefore would not reflect TRICARE's prior practice of paying full billed amounts; (3) calculating PCR would be administratively complex; (4) the base year PCR used by Medicare only represents a hospital's case mix at a certain point of time and does not change if the case mix changes; and (5) for hospitals with low TRICARE volumes, the calculation of PCR would not be statistically valid. AR107-08; *see also* 88 Fed. Reg. at 19,853 (AR23) (explaining that PCR is based on the "provider's base year cost report," which is "generally [calendar year] 1996," and that CCR is "practicable to adopt for TRICARE's comparatively smaller beneficiary population" and best "addresses issues of administrative complexity").

The notice of final rule also addressed a comment expressing concern that "adoption of OPPS reimbursement for" children's hospitals would "have an undesirable financial impact" on certain

children's hospitals, which could "pose a significant threat to their ability to service military families." *Id.* at 19,846 (AR16).  DoD agreed "that some children's hospitals will have reduced TRICARE payments," but noted that its analysis indicates that "some children's hospitals will see large increases in their TRICARE payments."  *Id.*

For those hospitals that would receive reduced TRICARE payments, DoD emphasized two aspects of the rule that would mitigate any undesirable financial impact.  *First*, the hospitals would be reimbursed their full costs.  *Id.* at 19,848 (AR18).  Thus, "[i]f the hospital's costs, as calculated by DHA" using the CCR ratio, "exceeded the payment that had been made under OPPS, the hospital shall receive an annual payment adjustment so that the hospital receives 100% of their costs."  *Id.* at 19,856 (AR26) (codified at 32 C.F.R. § 199.14(a)(6)(ii)(E)(4)).  *Second*, and independent of the hold harmless provisions, a General Temporary Military Contingency Payment Adjustment (GTMCPA) would be available to allow children's hospitals to receive payment in excess of their costs to ensure continued access to covered services for TRICARE beneficiaries, *id.* at 19,853 (AR23).  Specifically, through GTMCPAs, eligible cancer and children's hospitals could receive 115% percent of the hospital's costs for covered services.  *Id.*[9]  DoD emphasized that expanded availability for GTMCPAs would ensure the final rule "can be implemented for children's hospitals without jeopardizing access for TRICARE beneficiaries."  *Id.* at 19,846 (AR16).  In short, hospitals would receive on an annual basis a payment for the difference between the costs the hospital incurred in providing covered services and the amount the hospital was paid for covered services (if such a difference existed), and hospitals eligible to receive GTMCPAs could receive a separate discretionary payment of up to 15% of the hospital's costs incurred in the provision of covered services.

The final rule became effective October 1, 2023.  *See* AR35.

---

[9] DoD "tailored for CCHs" the eligibility requirements for a hospital to receive a GTMCPA.  88 Fed. Reg. at 19,845 (AR16).  The criteria are:  "(1) 10 percent or more of the hospital's revenue is from TRICARE for care of [active-duty service members and their dependents]; (2) the hospital having 10,000 or more TRICARE visits that would fall under the OPPS payment system for [active-duty service members and their dependents]; and (3) the hospital being deemed as essential for TRICARE operations."  *Id.*

## II.      FACTUAL BACKGROUND

Plaintiff Children's Hospital Colorado operates a network of children's hospitals and specialty outpatient facilities throughout the state of Colorado, including Children's Hospital Colorado and Children's Colorado Springs.  *See* ECF No. 1 ("Compl.") ¶ 8.  For years, Plaintiff has relied on the payment amounts it received from TRICARE—above and beyond the costs Plaintiff incurred to provide the covered services—to subsidize its operations and services for the entire community in which it resides.  In 2015, for example, DHA's independent cost estimates determined that Children's Hospital Colorado was receiving $2.26 million more than its estimated costs in payments from TRICARE.  *See* AR117.  DHA's independent analysis concluded that Children's Hospital Colorado was an outlier nationwide in that regard.  AR115-17.  In other words, Children's Hospital Colorado was utilizing TRICARE's reimbursement rules to receive significantly higher payment amounts—again, above its costs—in comparison to other children's hospitals around the country.

That discrepancy between the payment amounts that Plaintiff received and the amounts received by other hospitals around the country grew over time.  *See, e.g.*, Decl. of Elan P. Green ("Green Decl."), ¶ 10 (showing that by 2023, Children's Hospital Colorado was receiving $9.6 million more than its costs, millions more than any other hospital assessed).  Indeed, when Plaintiff raised concerns regarding its reimbursement amounts under the final rule in the summer of 2023, DoD conducted an analysis to further assess the basis on which Plaintiff was claiming the final rule would cause significant revenue declines.  *Id.*  That analysis determined the Plaintiff's revenue would decline because Plaintiff was receiving payments for services in amounts that drastically exceeded both the costs that Plaintiff incurred to provide those services and the amounts that other hospitals received.  *Id.* ¶ 16-17.

For example, the Green Declaration compares the amounts that Children's Hospital Colorado at Colorado Springs received for the five billing codes pertaining to different hospital outpatient facility services provided in emergency rooms with the average of the amount received by 34 other large children's hospitals from October 2022 to June 2023.  *Id.* ¶ 16.  The charges for these codes exclude the professional charges for services performed by physicians and charges for supplies—they

are purely the facility charges that hospitals bill for providing the facility in which the patient is examined. *Id.* This comparison shows that for all five of these billing codes, Children's Hospital Colorado was receiving significantly more than the average large children's hospital. Indeed, for four of these five billing codes, Children's Hospital Colorado was receiving multiples of 2.13 to 3.88 of the average amount received by 34 other large children's hospitals. *Id.* For example, where 34 other children's hospitals received, on average, $1,281 for the 13,528 instances in which the billing code 99283 was billed over the relevant time period, Children's Hospital Colorado at Colorado Springs received $2,875 for the 2,075 instances in which that code was billed. *Id.* Plaintiff had thus billed charges "that could be up to 380 percent more than the average large children's hospital." *Id.* ¶ 17. And Plaintiff's own declarations make clear that these surplus amounts were used to subsidize Plaintiff's other operations, including "community health improvement; health professional education; research; subsidized health services; and various other efforts to address community health." *See* Declaration of Jeff Harrington, ECF No. 13-2 ("Harrington Decl."), ¶¶ 34-35.

## III.    THIS LITIGATION

On September 29, 2023, Plaintiff filed its Complaint asserting two counts against Defendants. ECF No. 1. On October 12, 2023, Plaintiff moved for a preliminary injunction. Pl.'s Mot. for Prelim. Inj., ECF No. 13 ("PI Br."). Following the joint submission of competing scheduling proposals, *see* ECF No. 19, this Court entered a briefing schedule for combined briefing on Plaintiff's motion for preliminary injunction and cross-motions for summary judgment. ECF No. 20. Defendants now oppose Plaintiff's motion for a preliminary injunction and move for judgment on the administrative record on all claims.

### LEGAL STANDARDS

When evaluating a challenge to an agency's interpretation of a statute, a court should first ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If it has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-

43. Where Congress has not spoken directly to the issue at hand, the court should defer to the agency's interpretation so long as it is "based on a permissible construction of the statute." *Id.* at 843. That is true "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). And broad deference to an agency's statutory construction is particularly appropriate in contexts that involve a "complex and highly technical regulatory program," such as Medicare, which require "significant expertise and entail the exercise of judgment grounded in policy concerns." *Thomas Jefferson Univ. Hosp. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Pauley v. Bethenergy Mines, Inc.*, 501 U.S. 680, 697 (1991).

When reviewing agency action under the APA, a court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard "is narrow" and "very deferential to the agency." *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020) (quoting *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013). The reviewing court "presume[s] that an agency action is valid unless the party challenging the action proves otherwise," *id.*, and "will 'uphold the agency's action if it has articulated a rational basis for the decision and has considered relevant factors,'" *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1153 (10th Cir. 2019) (quoting *Wolfe v. Barnhart*, 446 F.3d 1096, 1100 (10th Cir. 2006). In short, the arbitrary-and-capricious standard simply "requires that agency action be reasonable and reasonably explained." *F.C.C. v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). And because this case implicates military affairs, the Court's review under the APA is even more deferential. *See Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (Because of the "healthy deference to legislative and executive judgments in the area of military affairs," courts employ a relaxed scrutiny in reviewing military policy.).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To justify such a remedy, "the movant must establish that four equitable factors weigh in its favor: (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

## ARGUMENT

### I.  THE FINAL RULE IS LAWFUL.

#### A.  The Final Rule Is Neither In Excess Of DoD's Statutory Authority Nor Contrary To Law.

In FY02 NDAA, Congress mandated that DoD adopt by regulation reimbursement rules that determine payment amounts to the extent practicable "in accordance with the same reimbursement rules as apply to payments to providers of services of the same type under [Medicare]." 10 U.S.C. § 1079(i)(2).  The final rule implements that statutory mandate and is therefore fully consistent with DoD's statutory authority and the relevant legal framework.  Plaintiff's arguments to the contrary are unavailing.

1. Plaintiff argues that the final rule exceeds DoD's statutory authority because Congress's directed the Secretary to "assure that medical care is available for [military] dependents." PI Br. 17 (quoting 10 U.S.C. § 1079(a)).  Plaintiff thus urges this Court to hold that any rule that could have the ultimate effect of decreasing the medical care available to a TRICARE beneficiary at any civilian hospital exceeds DoD's statutory authority under 10 U.S.C. § 1079(a).  But neither the text nor purpose of the statutory scheme constrain in this manner the Secretary's broad discretion.

To the contrary, while assuring the availability of medical care for military dependents was the overall purpose of the Dependents' Medical Care Act, Pub. L. 569, 70 Stat. 250 (1956), Congress granted the Secretary expansive discretion to effectuate that purpose.  Congress specifically directed

the Secretary to "contract, under the authority of this section, for medical care for [dependents of members of the uniformed services] under such insurance, medical service, or health plans *as he considers appropriate*." 10 U.S.C. § 1079(a) (emphasis added). This is indisputably a broad grant of statutory discretion. *See Villarreal-Dancy v. U. S. Dep't of the Air Force*, 633 F. Supp. 3d 19, 23 (D.D.C. 2022) (characterizing statute that authorizes Secretary to "assign such of his functions, powers, and duties as he considered appropriate" as "'broad statutory discretion'") (quoting 10 U.S.C. § 9013(f)).

And nothing within this broad grant of statutory discretion requires the Secretary to ensure medical care is available for military dependents in civilian hospitals. Indeed, when Congress passed the Dependents' Medical Care Act containing the instruction to the Secretary to "assure the availability of medical care" for military dependents, health care was generally provided at military medical treatment facilities run by the uniformed services, meaning there was only limited entitlement to any medical care at civilian hospitals. *See* Pub. L. 569, Title II, §§ 201-204. Accordingly, Congress's statutory instruction that the Secretary "assure that medical care is available for [military] dependents," which issued when the care contemplated by that instruction was primarily obtained through military hospitals, cannot be construed as a prohibition on any regulation that *could* have the effect of decreasing access to civilian care. *See Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (statutory phrases "must be read and interpreted in their context, not in isolation") (citation omitted); *Maracich v. Spears*, 570 U.S. 48, 65 (2013) ("[I]nterpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning.").

Moreover, any rule that limits or decreases the amounts paid to providers could, under Plaintiff's logic, have the effect of decreasing access to certain forms of care in civilian children's hospitals. But there can be no question that Congress intended TRICARE to adopt Medicare's reimbursement rules to reduce or limit the amount paid to providers. Indeed, that Congress intended the adoption of Medicare rules to limit or reduce the amounts paid to providers is clear from the title of the subsection amending Section 1079(i)(2) in FY02 NDAA: "TRICARE program *limitations* on payment rates for institutional healthcare providers …." FY02 NDAA § 707 (emphasis added). *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("'[T]he heading of a section'" is a "'tool[]

16

available for the resolution of a doubt' about the meaning of a statute.") (quoting *Bhd. Of R.R. Trainmen v. Balt.e & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947)); *Yates v. United States*, 574 U.S. 528, 540 (2015) (subsection headings "supply cues" as to Congress's intent).

And Congress effected this limitation or reduction in the amounts to be paid to providers through *mandatory* language.  While DoD previously had discretion to adopt reimbursement rules without reference to those adopted by Medicare, Congress constrained that discretion with the mandatory instruction that Medicare's reimbursement rules "shall" serve as the reference point, 10 U.S.C. § 1079(i)(2).  *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").  This plain command, intended to decrease the amount of the payments made to providers, cannot be squared with Plaintiff's construction of the statutory scheme that prohibits *any* limitation on the amounts paid to providers if that limitation could reduce services provided by civilian hospitals.

At most, it is ambiguous as to whether Congress intended to prohibit DoD from issuing any reimbursement rules that have the effect of reducing services available in civilian hospitals.  In such circumstances, DoD had authority to issue reimbursement rules that are reasonable in light of the broader statutory scheme, which is true of the final rule, *infra* 19-29.  *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 277 (2016) ("granting the agency leeway to enact rules that are reasonable in light of the text, nature, and purpose of the statute" when statute is open to multiple reasonable interpretations). And DHA, as a significantly smaller agency than the Center for Medicare and Medicaid Services (CMS),[10] was entitled to account for the practicability of administering the TRICARE program in construing the TRICARE statutory scheme and issuing the final rule.  *See Catskill Mountains Ch. of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 529 & n.34 (2d Cir. 2017) (deferring to agency's interpretation of a statute that sought to avoid the "potential for such disruptive results" and finding

---

[10] In 2021, Medicare spending totaled $900.8 billion nationwide.  *See* Centers for Medicare & Medicaid Services, "National Health Expenditure Data Fact Sheet," *available at*:  https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/nhe-fact-sheet.   TRICARE is many orders of magnitude smaller, accounting for only $18.5 billion of DoD's budget.  *See* Defense Health Agency, "About MHS," *available at*:   https://www.health.mil/About-MHS/OASDHA/Defense-Health-Agency.

this desire to avoid burdensome disruption "could support the EPA's interpretation of the Clean Water Act"); *see also Nat'l Auto. Dealers Ass'n v. Fed. Trade Comm'n*, 864 F. Supp. 2d 65, 80 (D.D.C. 2012) (concluding that it was "reasonable and desirable" for the agency to interpret the statute in a way that avoided burdensome "practical effects" of alternative interpretation).

2.  Plaintiff also argues that the final rule is contrary to law because "Congress has spoken on whether the reimbursement system used by Medicare is practicable" when it prescribed a specific methodology by which hold-harmless payments are to be calculated for cancer and children's hospitals under Medicare.  PI Br. 19 (citing 42 U.S.C. § 1395l(t)(7)(D)(ii); 42 C.F.R. § 419.70(d)(3)).  Plaintiff's argument assesses practicability from the wrong vantage point.  That Congress determined a particular methodology is practicable for Medicare has no bearing on whether that methodology is practicable for an entirely different agency (DoD) administering an entirely different entitlement program (TRICARE) for an entirely different set of beneficiaries (military members and their dependents).

Read as a whole, the TRICARE statutory framework makes clear that practicability should be assessed from the perspective of the DoD in administering the TRICARE program, not from the perspective of the Centers for Medicare and Medicaid Services in administering Medicare.  The TRICARE regulations are to be issued by the "administering Secretaries," which in this context is the Secretary of DoD.  *See* 10 U.S.C. § 1072(3) (defining "administering Secretaries" to mean "the Secretaries of executive departments specified in section 1073"); 10 U.S.C. § 1073(a)(1) (specifying the administering secretary is the Secretary of Defense when administering TRICARE for members of the armed forces); 10 U.S.C. § 1073(a)(2) (unless expressly provided for otherwise, "the Secretary of Defense shall have responsibility for administering the TRICARE program and making any decision affecting such program").  The Secretary of Defense, who does not administer Medicare, is obviously poorly positioned to assess practicability of reimbursement rules from the perspective of CMS, illustrating the absurd outcome of Plaintiff's construction.  *United States v. Turkette*, 452 U.S. 576, 580 (1981) ("absurd results are to be avoided").

Indeed, if Congress had intended DHA to apply any reimbursement rule determined to be practicable for Medicare, Congress would simply have bypassed methodology entirely and prescribed

that the amounts DHA pays cancer and children's hospitals must be the same as those paid for the same services under Medicare.  Congress adopted this very approach when specifying how the Secretary must calculate payment for non-institutional health care providers such as individual health care professionals.  *See* 10 U.S.C. § 1079(h)(1) (specifying that the amount paid should be "equal to an *amount* determined to be appropriate, to the extent practicable, in accordance with the same reimbursement rules as apply to payments for similar services under [Medicare]") (emphasis added). But Congress did not constrain the Secretary's discretion to adopt a different payment methodology from that used by Medicare in the context of institutional providers such as hospitals.  This illustrates that Congress envisioned that DoD would depart from Medicare's reimbursement methodology for institutional providers where necessary.  *See Bates v. United States*, 522 U.S. 23, 29-30 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Moreover, Plaintiff's statutory construction would render the phrase "to the extent practicable" in Section 1079(i)(2) entirely meaningless.  Any reimbursement methodology that Medicare adopts is by definition practicable for Medicare.  *Practicable*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "practicable" as "reasonably capable of being accomplished; feasible in a particular situation" and "capable of being used; usable").  If Congress intended that DHA adopt every reimbursement rule determined to be practicable *for Medicare*, Congress would have omitted entirely the condition that Medicare's reimbursement rules be adopted "to the extent practicable" because all Medicare reimbursement rules are practicable from that perspective.  And "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

Accordingly, Defendants did not exceed their statutory authority in issuing a final rule that modified Medicare's reimbursement rules for outpatient services provided in children's hospitals to render those rules feasible for DHA.  Rather, such modifications to account for the fact that DHA is a different agency serving a different purpose are precisely what Congress intended when instructing

the Secretary to issue regulations adopting Medicare's reimbursement rules "to the extent practicable." *See Catskill Mountains*, 846 F.3d at 529 & n.34; *Nat'l Auto. Dealers Ass'n*, 864 F. Supp. 2d at 80.[11]

## B.    The Final Rule Is Not Arbitrary, Capricious, Or An Abuse Of Discretion.

The final rule is not only required under the best reading of Section 1079(i)(2) and the broader TRICARE statutory scheme, but also adequately explained and justified based on the administrative record.  DoD carefully considered the very issue at the core of Plaintiff's lawsuit—that lower rates would financially harm children's hospitals and therefore potentially decrease access to service—both before issuing the notice of proposed rulemaking, *see, e.g.*, AR105-123 (independent expert report assessing likely financial impact of rule on cancer and children's hospitals), and during the rulemaking process, *see* AR16 (notice of final rule addressing comment regarding financial impact of rule on children's hospitals).  Indeed, as part of the final rule, DoD enacted carefully considered proposals to address this issue, including hold-harmless payments that would ensure cancer and children's hospitals were paid their full costs and discretionary payments of up to 115% of an eligible hospital's costs to ensure continued access to medical services for TRICARE beneficiaries.  For the reasons explained below, the APA requires no more.

### 1.    DoD Adequately Explained The Final Rule.

Plaintiff first argues that DoD did not adequately explain its conclusions that modifications to the Medicare reimbursement rules for children's hospitals were necessary to render the rules practicable for DHA.  PI Br. 20-22.  Plaintiff overlooks the detailed explanation that DoD provided for adopting a different methodology than that used by Medicare to calculate the hold-harmless payments.  As the notice of the final rule explained, Medicare holds cancer and children's hospitals harmless by paying the greater of either OPPS payments or an amount that is "an estimate of what the provider would have been paid during the [calendar year] for the same services under the Medicare

---

[11] *King v. Burwell*, 576 U.S. 473 (2015) (cited at PI Br. 19), is not to the contrary.  The Supreme Court in that case rejected a construction of ambiguous language in the Patient Protection and Affordable Care Act that would have undermined the purpose evident in the broader structure of the Act.  *Id.* at 494-98.  Here, there is no question based on both the text of the statute and the broader statutory scheme that Congress intended DoD to depart from Medicare's reimbursement rules where necessary to render those rules practicable for TRICARE.  *Supra* 15-19.

system that was in effect prior to OPPS." AR22-23; AR22 ("Medicare holds CCHs harmless by calculating their pre-Balanced Budget Act (BBA) amount."). The notice of final rule further explains that Medicare calculates this amount "by multiplying the provider's payment-to-cost ratio (PCR), based on the provider's base year cost report (generally [calendar year] 1996), times the reasonable costs the provider incurred during a calendar year to furnish the services that were paid under the OPPS." AR23. DoD explained that this approach would not be "practicable to adopt for TRICARE's comparatively smaller beneficiary population," and would create "issues of administrative complexity which led the agency to exempt [cancer and children's hospitals] in the original implementation of OPPS." *Id.*; *see supra* at 10-12. DoD further noted that Medicare adopts an adjustment for cancer hospitals that is statutorily mandated by the Patient Protection and Affordable Care Act. *Id.* DoD explained that because it is not subject to that Act, it would be impractical for DoD to adopt Medicare methodology mandated under that Act. *Id.*

This comprehensive explanation is a far cry from the "passing reference to administrative burden[s] and complexit[ies]" that Plaintiff describes (PI Br. 20) as the sole justification for DoD's modifications to Medicare's reimbursement rules. It is also more than sufficient under the APA. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (court will uphold as sufficient an agency's explanation so long as "the agency's path may reasonably be discerned") (quoting *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *Barker v. United States*, 404 F. Supp. 3d 251, 264 (D.D.C. 2019) (agency explanation "may be 'relatively simple and briefly stated'"); *City of Colorado Springs v. Chao*, 587 F. Supp. 2d 1185, 1194 (D. Colo. 2008), *aff'd sub nom. City of Colorado Springs v. Solis*, 589 F.3d 1121 (10th Cir. 2009) ("A terse administrative decision … will still pass muster under the arbitrary and capricious standard so long as the agency's reasoning is apparent from the explanation given.").

TRICARE's decision to transform Medicare's monthly calculation of interim hold-harmless payments into a single annual payment was similarly well justified. DoD explained that making these payments on an annual basis "reduces the administrative complexity of the system and makes the system practicable to adopt for TRICARE's comparatively smaller beneficiary population." AR22.

Indeed, the notice of final rule noted that a "precedent can be found in TRICARE's implementation of the reimbursement system for" other TRICARE providers in which reimbursements are made based on a "year-end comparison" between different payment methodologies.  *Id.*  While "relatively simple and briefly stated," this explanation is both logical and sufficient under the APA.  *Barker*, 404 F. Supp. 3d at 264.

Unsurprisingly given the fulsome explanation for its decision contained in the notice of the final rule, the record also refutes Plaintiff's claim (PI Br. 21) that "DoD gave no meaningful consideration to this issue at all."  DoD's independent experts carefully analyzed the possibility of using "the exact Medicare payment levels or method" and concluded it was neither "practicable nor advisable" to do so.  AR107-08.  Specifically, they determined that the ratio Medicare uses to calculate its hold-harmless payments would be impracticable and administratively complex for TRICARE to adopt, would not reflect the services provided to TRICARE patients or TRICARE's prior billing practices, and may not accurately hold harmless many hospitals with low TRICARE volumes.  *Id.* Likewise, DoD's independent experts determined that monthly reconciliations "would be burdensome and costly for TRICARE," noting that annual reconciliations "are done for comparable TRICARE payment systems."  AR107.  And this analysis informed the agency's decision.  The decision memorandum explains that calculating hold harmless payments using the modified methodology "is far simpler than the Medicare system and practicable."  AR139.  Accordingly, DoD adequately explained the ways in which the final rule modifies Medicare's reimbursement rules to render those rules practicable for TRICARE.

## 2.  DoD Adequately Considered The Relevant Issues.

Plaintiff argues that DoD failed to consider whether its two limited departures from Medicare's reimbursement rules for children's hospitals were practicable as required by Section 1079(i)(2) because DoD did not consider whether the final rule is practicable from the financial perspective of children's hospitals.  PI Br. 21.  But that is not what the statutory scheme requires:  as explained *supra* 15-17, practicability is to be assessed from the perspective of DoD.  Indeed, the

TRICARE program creates an entitlement to coverage for medical services for TRICARE beneficiaries, not an entitlement to payment for providers. *See* 32 C.F.R. § 199.17(p)(1) ("Providers in the preferred provider network are not employees or agents of the Department of Defense or the United States Government … [T]he network provider is independent and not operating under the direction and control of the Department of Defense."); 32 C.F.R. § 199.2(b) (a "participating provider" must agree to accept the allowed amount specified by regulation as "the maximum total charge for a service or item rendered to a [] beneficiary"). Indeed, Plaintiff's evaluation of practicability from the perspective of a hospital would effectively grant any hospital in the country that services TRICARE beneficiaries a veto over any proposed reimbursement rule if any such hospital were to face revenue declines as a result of that rule. This cannot be the outcome that Congress intended. *See* *Turkette*, 452 U.S. at 580 ("absurd results are to be avoided").[12]

In any event, even if practicability were to be assessed from the perspective of children's hospitals rather than DoD, DoD adequately considered that issue as evidenced in the notice of final rule. In responding to a comment raising concerns regarding the undesirable financial implications of the rule for some children's hospitals,[13] DoD emphasized that "some children's hospitals will see large increases in their TRICARE payments." AR16. While Plaintiff may fall in the category of children's hospitals that "will have reduced TRICARE payments due to the rule's provisions," *id.*, that fact falls well short of establishing that DoD failed to consider the fact that some hospitals would receive lower payments, particularly in light of an administrative record to the contrary. *See San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011) ("When courts consider [APA] challenges, an agency's

___

[12] Plaintiff's reliance (PI Br. 21) on *Nat'l Wildlife Fed'n v. Norton*, 306 F. Supp. 2d 920 (E.D. Cal. 2004), is misplaced. That court's discussion of "practicable" concerned the difference between "practicable" and "possible," which has no relevance to the relevant question here: for whom must the rule be practicable? The text of Section 1079(i)(2) and broader statutory structure make clear practicability is to be assessed from the perspective of DoD.

[13] The comment that DoD addressed in the notice of final rule raised the same concerns that Plaintiff raised in the comment it submitted in collaboration with the Children's Hospital Association. *Compare* AR84-86 *with* AR60-63. Plaintiff concedes as much. *See* PI Br. 11 ("The CHKD Comment, like the CHA Comment, emphasized that DoD was likely significantly underestimating the 2019 Proposed Rule's impact on children's hospitals.").

decision is entitled to a presumption of regularity, and the challenger bears the burden of persuasion.") (citation omitted). Indeed, that DoD established GTMCPAs—additional, discretionary payments that could result in an eligible hospital receiving up to 115% of the hospital's costs for covered services, AR16—for the express purpose of ensuring the rule would not jeopardize access to children's hospitals for TRICARE beneficiaries demonstrates that the issue was considered. Plaintiff's conclusory assertion (PI Br. 21-22) that DoD failed to consider whether the rule "effectuated Congress's intent to 'assure'" the availability of medical care because it "failed to consider the financial impact on children's hospitals" therefore lacks any support in the record.

And the authorities on which Plaintiff relies (PI Br. 22) are readily distinguishable on this basis. In *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1913 (2020), the Supreme Court emphasized that the memorandum memorializing the challenged administrative action "contain[ed] no discussion" whatsoever of a critical issue, unlike the notice of final rule in this case that directly addressed the very concern Plaintiff raises. *See also id.* ("[Agency] 'entirely failed to consider [that] important aspect of the problem.'"). *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 707 (10th Cir. 2009), addressed an agency's "unanalyzed, conclusory assertion that its modified plan would have the same type of effects as previously analyzed alternatives." And *Wages & White Lion Investments, L.L.C. v. United States Food & Drug Administration*, 16 F.4th 1130, 1138-39 (5th Cir. 2021), concerned an FDA statement on marketing plans that was "conclusory, unsupported, and thus wholly insufficient." Those administrative processes bear no resemblance to the detailed economic analysis of the proposed rule on the 25 largest TRICARE cancer and children's hospitals on which DoD relied in this case. *See* AR115-17.

Accordingly, while "[r]easonable minds may differ on the desirability of proceeding with the" final rule "despite these costs" to certain children's hospitals, "that is not enough to show that [the agency] 'failed to consider an important aspect of the problem' or the relevant factors." *Am. Petroleum Inst. v. U. S. Dep't of Interior*, 81 F.4th 1048, 1063 (10th Cir. 2023) (quoting *New Mexico ex rel. Richardson*, 565 F.3d at 704). Indeed, even if this Court would reach a different conclusion, it "cannot 'second[] guess' an agency's rulemaking decision when it provided 'reasons for [its] chosen course of action.'"

*New Mexico Health Connections v. United States Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1167 (10th Cir. 2019).

### 3.  The Final Rule Is Consistent With DoD's Reasoning.

Plaintiff asserts that the final rule is inconsistent with DoD's reasoning because it fails to ensure that children's hospitals are reimbursed for their actual costs.  PI Br. 22-23.  This argument rests entirely on the Declaration of Jeff Harrington, ECF No. 13-2 ("Harrington Decl."), which identifies five categories of costs that are purportedly not covered by the cost report that TRICARE uses to determine the cost-to-charge ratio when calculating the hold-harmless payments under the final rule:  costs of ensuring access to specialized pediatric care, research costs, specialty pharmacy costs, dental care costs, and community outreach costs.  Harrington Decl. ¶¶ 13-14.  But Plaintiff misapprehends the purpose of the hold-harmless payments, which are intended to reimburse the provider only for the costs that the provider incurs in the provision of services covered by the challenged rule.  Each of the categories of costs that Plaintiff identifies are reimbursed under different rules or were never covered services for which providers could obtain reimbursement from TRICARE.

While costs to ensure access, conduct research, or perform community outreach may impact a hospital's bottom line, they are not costs specifically incurred in the prevention, diagnosis, or treatment of TRICARE beneficiaries.  Accordingly, those costs pertain to services that TRICARE does not reimburse.  *See* 10 U.S.C. § 1079(a)(12) ("Any service or supply which is not medically or psychologically necessary to prevent, diagnose, or treat a mental or physical illness, injury, or bodily malfunction as assessed or diagnosed by a physician, dentist, clinical psychologist, certified marriage and family therapist, optometrist, podiatrist, certified nurse-midwife, certified nurse practitioner, certified clinical social worker, or other class of provider as designated by the Secretary of Defense, as appropriate, may not be provided[.]").  Plaintiff therefore cannot expect to receive reimbursements for costs that do not pertain to services that TRICARE covers, under the final rule or otherwise.

Likewise, dental care and specialty pharmacy services provided to TRICARE beneficiaries are largely outside the scope of the challenged rule. TRICARE generally does not pay for dental care whatsoever. *See* 32 C.F.R. § 199.4(e)(10) ("TRICARE/CHAMPUS does not include a dental benefit."). The limited exception applies "for dental services and supplies when the dental services are adjunctive to otherwise covered medical treatment." *Id.* But in those circumstances, dental care would generally be provided as a professionally provided service reimbursed under a different methodology. *See id.* § 199.14(a)(6)(i)(J) (explaining that "professional provider services" are outpatient services "not subject to [OPPS]," the challenged payment methodology). Specialty pharmacy services, such as drugs administered other than by oral method, are also reimbursed outside the scope of the challenged rule. *See* 32 C.F.R. § 199.14 (a)(6)(i)(I) (explaining that "drugs administered other than by oral method" are outpatient services "not subject to [OPPS]," the challenged payment methodology). Accordingly, to the extent Plaintiff provides covered dental care or specialty pharmacy services to TRICARE beneficiaries, Plaintiff is already being reimbursed for those services under different reimbursement rules. Any additional payment made to hold a hospital harmless for costs incurred in the provision of hospital outpatient services would result in the hospital being reimbursed twice for the same service. Plaintiff identifies no provision in the TRICARE statutory scheme that compels such an outcome.

Plaintiff therefore has failed to demonstrate that the final rule governing reimbursement for *hospital outpatient services* in fact fails to compensate cancer and children's hospitals for the costs those hospitals incur in providing *hospital outpatient services*. To the contrary, the hold-harmless payments fully reimburse the costs that a hospital incurs in providing services covered by the final rule. Moreover, and independent of the hold-harmless payments, the discretionary availability of GTMCPAs ensures that eligible hospitals could receive up to 115% of the costs those hospitals incurred in providing hospital outpatient services. *See* AR16. The final rule is therefore fully consistent with DoD's reasoning by reimbursing all hospitals their full costs for the provision of covered services and making available for certain eligible hospitals additional amounts to ensure continued access to care.

**4.  DoD Adequately Responded To Comments Received In The Rulemaking Process.**

Plaintiff argues that DoD failed to respond to comments raising concerns that applying the final rule to children's hospitals could reduce access to care.  PI Br. 24.  The notice of final rule flatly refutes this assertion.  In that document, DoD addressed a comment suggesting that DoD maintain the current exclusion of children's and cancer hospitals from the new methodology because the proposed rule would "have an undesirable financial impact on their Children's hospital and other Children's Hospitals that serve large TRICARE populations," which may ultimately "pose a significant threat to their ability to service military families."  AR16.  This is the precise concern raised by Plaintiff in this action.  And DoD responded to that concern fully:  it explained that it "agrees that some children's hospitals will have reduced TRICARE payments," but noted that other children's hospitals—namely those that were not billing well in excess of their costs—would see "large increases in their TRICARE payments."  *Id.*  DoD further explained that the proposed rule authorized GTMCPAs (additional payments beyond the hospital's incurred costs) which would provide additional payments for children's hospitals that serve a significant TRICARE beneficiary base to minimize any threat to access to care for TRICARE beneficiaries.  *Id.*  Because DoD "rationally explained its basis for disagreeing with the comments" that Plaintiff's identify, it has satisfied its obligations under the APA.  *Heal Utah v. U. S. Env't Prot. Agency*, 77 F.4th 1275, 1293 (10th Cir. 2023).

Plaintiff nonetheless claims that explanation DoD provided is not enough because one comment proposed "solutions" of either exempting all children's hospitals from the final rule or "grandfathering certain children's hospitals."  PI Br. 24-25.  But the notice of final rule expressly referenced these alternatives, noting that the "suggestions ranged from continuing to reimburse Children's Hospitals at billed charges or 'grandfathering' certain facilities that are in close proximity to military bases that treat a disproportionate share of TRICARE beneficiaries."  AR16.  DoD rejected these suggestions because cancer and children's hospital would be held harmless for any costs they incur in the provision of covered services, AR18, and because GTMCPAs would preserve "access for TRICARE beneficiaries," AR16.  This far exceeds the "the level of specificity" that the APA requires.

*Am. Petroleum Inst.*, 81 F.4th at 1062.  Indeed, in responding to comments, "an agency need not 'discuss every item of fact or opinion included in the submissions made to it.'"  *Id.* (quoting *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015); *see also Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1234 (9th Cir. 1993) (an agency has "no obligation to make references in the agency explanation to all the specific issues raised in comments").  Accordingly, an agency's response is sufficient where, as is the case here, it "enable[s] [the court] to see what major issues of policy were ventilated … and why the agency reacted to them as it did.'"  *Del. Dep't of Nat. Res.*, 785 F.3d at 15 (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)).  By addressing the relevant comment, DoD enabled this Court to see that it considered whether the rule would have significant financial implications for children's hospitals that could result in decreased access to service.  Such a response is "sufficient to satisfy the requirements of the APA." *Cement Kiln Recycling Coal. v. Env't Prot. Agency*, 493 F.3d 207, 226 (D.C. Cir. 2007).[14]

### 5.  DoD Did Not Arbitrarily Change Agency Practice.

Finally, Plaintiff argues that DoD arbitrarily changed course by adopting modified versions of Medicare's reimbursement rules after declining to do so in the years immediately after FY02 NDAA passed.  PI Br. 25-26.  Not so.  DoD was clear when first declining to adopt Medicare's reimbursement rules for hospital outpatient facilities that DoD would do so eventually.  DoD's interim final rule implementing FY02 NDAA fully disclosed that that "[c]onsistent with the TRICARE payment reform statutory authority and general policy, we plan to follow the Medicare approach" and "anticipate eventual adoption of the Medicare OPPS for most TRICARE hospital outpatient services covered by the Medicare OPPS."  67 Fed. Reg. at 40,601.  Accordingly, the gradual adoption of Medicare's reimbursement rules for hospital outpatient services is not a departure from DoD's stated policy, but the very implementation of that policy.

---

[14] Moreover, courts have recognized that suggestions similar to those Plaintiff emphasizes—that DoD apply different payment methodologies to different children's hospitals by "grandfathering" in certain children's hospitals to their preferred higher rates—"seem[] arbitrary and result-oriented given the process an agency is supposed to engage in." *Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1215 (10th Cir. 2006).

And even if the challenged final rule were a departure from prior agency policy (it was not), the fact that DoD had previously determined adopting Medicare's reimbursement rules was not practicable does not alter this Court's analysis. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009) ("We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review."). All DoD must do is "show that there are good reasons for the new policy," as is true of any administrative action. *Id.* at 515 (explaining the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates"). *See also Bradford v. U.S. Dep't of Lab.*, 582 F. Supp. 3d 819, 842 (D. Colo. 2022) (agency adequately justifies change of course where "there are good reasons for the new policy"); *Am. Petroleum Inst.*, 81 F.4th at 1062 ("Because ONRR gave a reasoned explanation for reversing its prior policy, API's first argument against the DWP's rescission falls short.").

DoD acknowledged that it had previously determined cancer and children's hospitals were exempt from DoD's adoption of Medicare payment methodology based on administrability concerns, but concluded that it "now has the capability, and it is feasible, to adopt Medicare's reimbursement provisions" based on adjustments to the program that DoD determined over time were feasible. *See* AR18 (explaining that DoD is applying the hold-harmless payments on an annual rather than monthly basis as result of DoD's experience implementing Medicare's reimbursement system for other categories of covered service). If the challenged final rule were considered a reversal of DoD's policy, DoD has therefore readily carried its burden to explain that change of course.

## II.   PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED

If this Court grants Defendants' motion for judgment on the administrative record, it need not reach Plaintiff's motion for a preliminary injunction, which can be denied summarily as moot. *See, e.g.*, *Merrell v. Allred*, No. 11-cv-02291-REB-MJW, 2013 WL 1365767, at *1 (D. Colo. Apr. 4, 2013) (granting defendants' motion for summary judgment and denying as moot plaintiff's motion for a

preliminary injunction); *McBride v. Bank of Am.*, No. 2:10-CV-960, 2012 WL 202619, at *1 (D. Utah Jan. 23, 2012), *aff'd*, 501 F. App'x 783 (10th Cir. 2012) (same).  But even if this Court denies all or part of Defendants' motion for judgment on the administrative record, Plaintiff cannot carry its burden to obtain the "extraordinary remedy"—"never awarded as of right"—of a preliminary injunction, *Winter*, 555 U.S. at 24.   Indeed, Plaintiff's burden is particularly heavy here because Plaintiff seeks an injunction that would alter the status quo by enjoining application of a rule that has already been effect for over six weeks as of the date of this filing.  *See Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (explaining "preliminary injunctions that alter the status quo" are "specifically disfavored" and "must be more closely scrutinized").

As a threshold matter, a preliminary injunction should not issue here because the "limited purpose" of a "preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009) (same).  No such preservation is necessary after the Court directed the parties to submit the entire case for resolution at the same time as Plaintiff's motion for preliminary injunction.  *See* ECF No. 20.  In any event, Plaintiff cannot establish a likelihood of success on the merits for the same reasons Defendants' motion for judgment on the administrative record should be granted, *supra* 15-29.  Nor can Plaintiff make the clear showing on the remaining factors necessary to obtain preliminary relief for the reasons explained below.

### 1.  Plaintiff Cannot Establish Irreparable Harm.

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation omitted).  Irreparable harm is more than "merely serious or substantial" harm.  *Id.* (citation omitted).  And the injury must be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citation omitted).  Therefore, Plaintiff "must establish both that harm will occur, and that, when it does, such harm will be irreparable." *Vega v. Wiley*, 259 F. App'x 104, 106 (10th Cir. 2007). Plaintiff is unable to make that showing here.

As an initial matter, Plaintiff's five-month delay between the publication of the final rule and its request for relief here refutes any claim of irreparable harm. That is because a "party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)); 138 S. Ct. at 1945 (finding that "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request"); S. *Ute Indian Tribe v. U.S. Dep't of the Interior*, No. 15-cv-01303, 2015 WL 3862534, at *1 (D. Colo. June 22, 2015) ("A movant's delay in seeking injunctive relief 'cuts against finding irreparable injury.'") (quoting *RoDa Drilling Co. v. Segal*, 552 F.3d 1203, 1211 (10th Cir. 2009)).

*Southern Ute* is directly on point. There, the plaintiff sought preliminary relief to challenge a final rule nearly three months after the final rule was issued and only two days before the rule became effective. *Id.* "In such circumstances, the 'imminence' of the alleged injury, and the corresponding need for [preliminary] relief to prevent it, is less a function of the Defendants' actions and more a function of [Plaintiff's] own unexplained delay in bringing suit." *Id.* Here, Plaintiff waited over five months—including nearly two weeks after the rule became effective—to seek preliminary relief, which provides strong evidence that Plaintiff does not meet the irreparable harm requirement.

Regardless, Plaintiff's claimed harm is not irreparable because "[i]t is … well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm." *Heideman*, 348 F.3d at 1189. Plaintiff claims (PI Br. 27) that any monetary loss would constitute irreparable harm because sovereign immunity bars recovery of that monetary loss from the government. But claims for supplies and services provided to TRICARE beneficiaries can be made up to a year after the service or supply was provided. 32 C.F.R. § 199.7(d) (implementing 10 U.S.C. § 1106(b)). Accordingly, should the Court determine the rule is invalid, as long as it does so before October 1, 2024, Plaintiff could submit its claims for services provided to TRICARE beneficiaries covering the effective period of the rule.

### 2. The Balance Of The Equities And Public Interest Do Not Support Injunctive Relief.

A party seeking a preliminary injunction must also "establish … that the balance of equities tips in [its] favor, and that [the] injunction is in the public interest." *Winter*, 555 U.S. at 20. These

factors merge when a plaintiff seeks an injunction against the Federal Government.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, the requested preliminary relief would require that DoD partially retract an already-implemented final rule.  This would create significant administrative and economic burden for DoD, other children's hospitals around the country, and TRICARE beneficiaries.  *See* Declaration of Elan P. Green ("Green Decl.") ¶¶ 4-15.  If an injunction were to issue, DoD would lose out on the tens of millions of dollars in cost savings that the rule is intended to provide, *id.* ¶¶ 5-7, and incur administrative costs to rollback the final rule, *id.* ¶ 4.  Many other children's hospitals that stand to see increases in TRICARE payments under the new rule would have their payments reduced if the rule were enjoined, and those other hospitals would lose the costs that they may have incurred to adjust their billing practices in compliance with the new rule.  *Id.* ¶¶ 10-11.[15]  Additionally, those other children's hospitals eligible for GTMCPAs would lose the availability of those additional, discretionary payments.  *Id.* ¶ 12.  Finally, TRICARE beneficiaries themselves would lose out on likely savings that the final rule is estimated to provide.  *Id.* ¶¶ 14-15.  Individually (and particularly in aggregate) these equities far exceed the self-inflicted harm that Plaintiff's billing practices have imposed, *see id.* ¶¶ 16-17.

Plaintiff nonetheless claims (PI Br. 28) that the "balance of harms weighs in favor of the injunction" because the relief sought "will preserve the *status quo*."  Not so.  The final rule had already been in effect for nearly two weeks when Plaintiff filed its motion for preliminary injunction.  *Compare* AR24 (effective date for regulation of October 1, 2023) *with* ECF No. 13 (filed October 12, 2023).  By the time of the hearing scheduled for March 5, 2024, *see* ECF No. 20, the final rule will have been in place for over five months.  Accordingly, the relief requested would disrupt the *status quo*.  And it will do so to the particular detriment of the numerous children's hospitals—those that are not billing well in excess of their costs—that "will see large increases in their TRICARE payments" as a result of the

---

[15]  Plaintiff's own evidence, the Declaration of Jeff Harrington, ECF No. 13-2, ¶ 15, claims that Plaintiff "is currently devoting significant resources towards understanding and changing its systems to be able to bill under the new methodology."  Other children's hospitals are likely doing the same, and those "significant resources" will have been lost if the challenged rule were enjoined.

final rule.  AR16.  The public interest does not favor such a disruption to a national reimbursement scheme for a single outlier hospital.

## III.    ANY RELIEF SHOULD BE APPROPRIATELY LIMITED TO THIS PLAINTIFF.

In the event the Court agrees with Plaintiff, any relief should be no broader than necessary to remedy the demonstrated harms of the specific Plaintiff in this case.  That is because "[t]he Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).  Here, this principle dictates that the Court should reject Plaintiff's request (PI Br. at 27) for a preliminary injunction that halts the application of the final rule as to *all* children's hospitals nationwide.  Instead, the Court should at most enjoin application of the challenged rule as to Plaintiff.  Indeed, a nationwide injunction would be both inequitable as to the numerous children's hospitals receiving "large increases" in TRICARE payments because of the final rule, AR16, and contrary to law, *see Department of Homeland Security v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions)); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (suggesting universal injunctions are inconsistent with "limits on equity and judicial power").

That Plaintiff brings its claims under the APA does not justify a departure from these equitable principles that limit this Court's ability to award nationwide relief.  Nothing in the APA's directive to "set aside" unlawful "agency action" mandates that "agency action" shall be set aside globally, rather than as applied to the plaintiffs.  5 U.S.C. § 706(2).  Finally, any equitable relief implicating the final rule in its entirety should be limited to the particular provisions, if any, that are found to be invalid. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (severing invalid provisions of a regulation).

## CONCLUSION

For the foregoing reasons, judgment on the administrative record should be entered for Defendants and Plaintiff's motion for a preliminary injunction should be denied.

DATED: November 16, 2023               Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       TERRY M. HENRY
                                       Assistant Branch Director

                                       /s/ Alexander W. Resar
                                       ALEXANDER W. RESAR
                                       Trial Attorney
                                       Civil Division, Federal Programs Branch
                                       U.S. Department of Justice
                                       1100 L Street, NW
                                       Washington, DC 20005
                                       Phone:   (202) 616-8188
                                       E-mail:   alexander.w.resar@usdoj.gov

                                       *Counsel for Defendants*