**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-02561-NYW-SBP

CHILDREN'S HOSPITAL COLORADO,

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF DEFENSE, and
LLOYD AUSTIN, III,

      Defendants.

---

### MEMORANDUM OPINION AND ORDER

---

Pending before the Court are the Parties' cross-motions for judgment on the administrative record. *See* [Doc. 23 ("Defendants' Motion"); Doc. 29 ("Plaintiff's Motion")]. The Court has reviewed the briefing, the record, and the applicable case law and, on March 5, 2024, the Court heard oral argument. [Doc. 36]. For the reasons set forth herein, the Court respectfully **GRANTS** Defendants' Motion and **DENIES** Plaintiff's Motion.

### BACKGROUND

"TRICARE" refers to the United States military's healthcare program. In this litigation, Plaintiff Children's Hospital Colorado ("Children's" or "Plaintiff") challenges a 2023 regulation that determines how the federal government reimburses private Cancer and Children's Hospitals ("CCHs") for outpatient services provided to TRICARE patients. Defendants United States Department of Defense ("DoD") and Secretary of Defense Lloyd Austin, III ("the Secretary" and, together with DoD, "Defendants") argue that the

challenged rule was within their legal authority and discretion to adopt, so it survives review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559.

## I.     TRICARE Reimbursement

Congress created TRICARE to provide healthcare for active-duty and retired servicemembers and their dependents, including at military healthcare facilities.  *See* 10 U.S.C. § 1071.  The relevant statutes were amended in the 1960s to cover DoD contracting for additional private-sector medical care reimbursements.  *See* Military Medical Benefits Amendments of 1966, Pub. L. No. 89-614, 80 Stat. 862 (1966).  Today, TRICARE largely resembles any other comprehensive managed health insurance program:  providers of private-sector care exist in relation to a network and seek reimbursement pursuant to complex claims-processing and billing mechanisms.  Unlike other health insurance plans, however, federal law provides that TRICARE is administered by the Secretary of Defense, 10 U.S.C. § 1073(a)(2), who has delegated his authority to the Defense Health Agency ("DHA"), *see* DoD Directive 5136.13, Defense Health Agency (Sept. 30, 2013).  This case concerns how TRICARE reimburses children's hospitals, as opposed to the individual healthcare providers associated with those hospitals, for facility fees for outpatient services.

The relevant statute authorizes the Secretary to "contract . . . for medical care for those persons under such insurance, medical service, or health plans as he considers appropriate," so as to "assure that medical care is available for dependents . . . of members of the uniformed services."  10 U.S.C. § 1079(a).  However, "[a]ny service or supply which is not medically or psychologically necessary to prevent, diagnose, or treat a mental or physical illness, injury, or bodily malfunction as assessed or diagnosed by a

. . . class of provider as designated by the Secretary of Defense, as appropriate, may not be provided." *Id.* § 1079(a)(12).

DoD sets out TRICARE's reimbursement rules by following the APA's general administrative rulemaking process—that is, promulgating regulations subject to notice and comment pursuant to a statutory grant of authority and discretion.  *See* 32 C.F.R. § 199.14; *see also* 5 U.S.C. § 553.  Since Congress passed the National Defense Authorization Act for Fiscal Year 2002 ("FY02 NDAA"), Pub. L. No. 107-107, 115 Stat. 1012 (2001), the relevant statute has read:

> The amount to be paid to a provider of services for services provided under a plan covered by this section shall be determined under joint regulations to be prescribed by the administering Secretaries which provide that the amount of such payments <u>shall be determined</u> to the extent practicable in accordance with the same reimbursement rules as apply to payments to providers of services of the same type under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.) [Medicare].

10 U.S.C. § 1079(i)(2) (emphasis added).  Until the FY02 NDAA, rather than "shall be determined," the provision said that payments to providers "may be determined" in a way that tracks Medicare.  10 U.S.C. § 1079(j)(2)(A) (2001); *see also Ingham Reg'l Med. Ctr. v. United States*, 874 F.3d 1341, 1343 (Fed. Cir. 2017) ("The statute previously permitted, but did not require, DoD to use Medicare reimbursement rules.").  In other words, the FY02 NDAA now requires TRICARE to mimic Medicare's methods "to the extent practicable." 10 U.S.C. § 1079(i)(2).  This statutory mandate spurred several rulemakings over the ensuing years as DoD sought to comply with 10 U.S.C. § 1079(i)(2).

## II.    Post–FYO2 NDAA Regulations

DoD's initial post–FY02 NDAA rulemaking did not cover reimbursements for any hospital outpatient services—at CCHs or otherwise.  That was because Medicare, in the early 2000s, was in the process of switching from reimbursing those providers pursuant

to pre–Balanced Budget Act ("BBA") methods to applying the newer Outpatient Prospective Payment System ("OPPS").  *See* "TRICARE; Sub-Acute Care Program; Uniform Skilled Nursing Facility Benefit; Home Health Care Benefit; Adopting Medicare Payment Methods for Skilled Nursing Facilities and Home Health Care Providers," 67 Fed. Reg. 40,597 (June 13, 2002) ("2002 Interim Final Rule").  In the 2002 Interim Final Rule, DoD noted that Medicare's adoption of OPPS entailed making certain transitional outpatient payments ("TOPs") for outpatient services providers that were not practicable for DoD to calculate in the context of TRICARE.  *Id.* at 40,601 ("[B]ecause of complexities of the Medicare transition process and the lack of TRICARE cost report data comparable to Medicare's, it is not practicable for the Department to adopt Medicare OPPS for hospital outpatient services at this time.").  However, DoD explained that, pursuant to the FY02 NDAA's amendment to 10 U.S.C. § 1079(i)(2), it would eventually work to adopt OPPS for the majority of hospital outpatient services reimbursements.  *See id.* ("A separate regulatory initiative in the future will address hospital outpatient services not covered by this regulation.  We anticipate eventual adoption of the Medicare OPPS for most TRICARE hospital outpatient services covered by the Medicare OPPS.").

Defendants' next rulemaking, in 2008, adopted OPPS for nearly all hospital outpatient services reimbursements, but left out CCHs.  *See* "TRICARE; Hospital Outpatient Prospective Payment System (OPPS)," 73 Fed. Reg. 74,945 (Dec. 10, 2008) ("2008 Final Rule").  With respect to excluding children's hospitals, DoD referenced the difficulty—just as it did in 2002—of calculating the TOPs paid by Medicare to hold those hospitals harmless as against the change to OPPS.  *Id.* at 74,948–49 (referencing "the administrative complexity of capturing the data required for payment of monthly interim

TOP amounts").   In the 2008 Final Rule, DoD indicated that calculating TOPs for children's hospitals would require comparing what TRICARE previously paid children's hospitals with the OPPS payment.  *See id.* at 74,949.

Medicare takes a distinct approach to reimbursing children's hospitals because they do not fit cleanly into the OPPS framework.  As Plaintiff points out in its opening brief, OPPS "includes metrics for MRIs to treat lower back pain and hospital visits following colonoscopies but does not include pediatric metrics."  [Doc. 13 at 8]; *see also, e.g.*, [Doc. 24-3 at 71 ("[C]hildren's hospitals' experience with the Medicare payment system is limited to their care for children with End-Stage Renal Disease who account for, on average, less than 1% of their payor mix.  Furthermore, children's hospitals' commercial contracts do not rely on the Medicare payment methodologies, given Medicare's adult focus.")].[1]   Accordingly, Congress has determined that, for purposes of Medicare reimbursement, children's hospitals will receive monthly hold-harmless payments in perpetuity.   *See* 42 U.S.C. § 1395l(t)(7)(D)(ii).   Those payments are calculated by multiplying a children's hospital's current costs by its payment-to-cost ratio ("PCR"), a historic figure which compares the hospital's pre-BBA, pre-OPPS, 1996 payments from Medicare to its 1996 costs.  *Id.* § 1395l(t)(7)(D), (F).

Neither the 2002 Interim Final Rule nor the 2008 Final Rule altered Defendants' approach to reimbursing CCHs for outpatient services.  Until the regulation challenged in this action was finalized, DoD reimbursed CCHs on a fee-for-services basis using billed charges and certain maximum allowable charge amounts.  *See* 73 Fed. Reg. at 74,949.

---

[1] The Court cites to the document and page number generated by the this District's Case Management/Electronic Case Filing system.

### III.    The 2023 Final Rule

On November 29, 2019, DoD issued a notice of proposed rulemaking in which it proposed adopting Medicare's OPPS for CCH outpatient services reimbursement, albeit with a few adjustments to account for practicability concerns.  *See* "TRICARE; Reimbursement of Ambulatory Surgery Centers and Outpatient Services Provided in Cancer and Children's Hospitals," 84 Fed. Reg. 65,718 (Nov. 29, 2019) ("2019 NPRM"); *see also* [Doc. 24-3 at 1–10].  A sixty-day comment period followed, and DoD issued the final rule on April 4, 2023, effective October 1, 2023.  See "TRICARE; Reimbursement of Ambulatory Surgery Centers and Outpatient Services Provided in Cancer and Children's Hospitals," 88 Fed. Reg. 19,844 (Apr. 4, 2023) ("2023 Final Rule"); *see also* [Doc. 24-3 at 14–26].  In this action, Plaintiff challenges the 2023 Final Rule, which is codified at 32 C.F.R. §§ 199.2, 199.6, 199.14.  *See* [Doc. 24-3 at 24–26].[2]  Several aspects of the regulation's text and the associated rulemaking process warrant further discussion before considering Plaintiff's arguments.

The 2019 NPRM and 2023 Final Rule acknowledged that prior rulemakings "opted to totally exempt CCHs from OPPS initially," stating that this was "[b]ecause of the complexity and because of the administrative burden/expense of calculating and maintaining the TOPs."  [*Id.* at 1, 18]; *see also* [*id.* at 107–09].  However, the explanation continued, DoD was "now revisiting the exemption of CCHs from OPPS" and adopting "the Medicare methodology for reimbursement of outpatient facility services . . . rendered

---

[2] Much of the 2023 Final Rule deals with reimbursing ambulatory surgery centers ("ASCs"), but TRICARE's methodology for reimbursing ASCs is not at issue in this litigation.  *See, e.g.*, [Doc. 13 at 4 n.1].  Nor does this action concern the reimbursement of cancer hospitals.  *See* [*id.*].

in a cancer or children's hospital, with modifications to address the administrative burden and complexity."  [*Id.* at 1, 18].  According to Defendants, the Secretary "now ha[d] the capability, and it [was] feasible, to adopt these reimbursement provisions," subject to select modifications.  [*Id.*].

The first modification is that hold-harmless payments—that is, payments designed to ease a transition in payment methodologies by holding the recipient hospital harmless as to the change—under the 2023 Final Rule are paid to CCHs annually.  [*Id.*].  Under Medicare, in contrast, these payments are made monthly.  DoD noted in the 2023 Final Rule that this approach is more practicable for a smaller beneficiary population and added that it similarly adapted the timing of reimbursement for another institution type by making annual payment adjustments, rather than replicating Medicare's monthly disbursements. [*Id.* at 22]; *see also* [*id.* at 107–08, 143 ("Allowing the calculation to be made annually reduces the administrative complexity that was the justification for exempting these facilities in the [2008] Final Rule.")].  In the section of the 2023 Final Rule dealing with alternatives the agency considered, DoD noted that "[i]t is practicable to adopt OPPS for these institutional providers, with *annual* hold harmless provisions."  [*Id.* at 24 (emphasis added)].

The second change is that hold-harmless payments under the 2023 Final Rule are based on the higher of the OPPS amount or the hospital's outpatient cost-to-charge ratio ("CCR") applied to its current costs.  [*Id.* at 22].  The CCR divides a hospital's costs by its billed charges.  Medicare, in contrast, calculates hold-harmless payments as the higher of OPPS or PCR applied to costs.  DoD observed in the 2023 Final Rule that "[t]his modification still holds the hospital harmless and ensures payment at costs, and is also

practicable to adopt for TRICARE's comparatively smaller beneficiary population, and addresses issues of administrative complexity which led the agency to exempt CCHs in the original implementation of OPPS." [*Id.* at 23]; *see also* [*id.* at 107–08 (analysis commissioned by DoD discussing several practicability concerns with use of PCR)]. Defendants explain that these "different ratios serve different purposes": "[w]hile PCR is used by Medicare to hold hospitals harmless relative to the payments they would have received before OPPS was implemented, CCR is used by DHA to hold hospitals harmless relative to the costs they incurred to provide the covered services." [Doc. 23-1 at 20].

The third change is that, at DHA's discretion, General Temporary Military Contingency Payment Adjustments ("GTMCPAs") are available to supplement CCH reimbursements at up to 115% of a hospital's costs for covered services where certain criteria, "which have been tailored for CCHs," are met. [Doc. 24-3 at 23]. The criteria are: (1) 10% of the hospital's revenue comes from TRICARE coverage for Active Duty Service Members ("ADSMs") and Active Duty Dependents ("ADDs"); (2) the hospital has 10,000 or more annual TRICARE visits that would fall under OPPS; and (3) the hospital is deemed essential for TRICARE operations. [*Id.*]; *see also* 32 C.F.R. § 199.14(a)(6)(ii)(E)(3).

As part of the notice-and-comment process for the 2023 Final Rule, DoD received two comments on the 2019 NPRM relevant to children's hospitals, one from the Children's Hospital Association ("CHA")[3] and one from Children's Hospital of The King's Daughters ("CHKD") in Norfolk, Virginia. [Doc. 24-3 at 70–74, 94–97]. The former principally asked DoD to "[e]xtend the comment and implementation timelines" for the 2019 NPRM and to

---

[3] Plaintiff indicates that it "collaborated" with CHA on this comment. [Doc. 29 at 15].

"[c]larify its data sources and analyses related to the financial impact of the rule on children's hospitals."  [*Id.* at 72].  The latter focused on the "devastating" impact of the proposed change in reimbursement on certain children's hospitals.  [*Id.* at 96–97].

The 2023 Final Rule responded to the commenters' position that adopting OPPS for CCHs would "have an undesirable financial impact" on children's hospitals serving large TRICARE patient populations.  [*Id.* at 16].  Specifically, DoD explained that the 2023 Final Rule would reimburse costs and, while some children's hospitals would receive reduced reimbursements relative to their prior payments, others would see their reimbursements rise.  [*Id.*].  To ameliorate any shortfall, DoD also noted that GTMCPAs were available, and the relevant criteria had been "tailored for CCHs."  [*Id.*].  With respect to reimbursement fluctuations, the 2023 Final Rule estimated that payments to CCHs would decrease by approximately $35 million in the aggregate, but some institutions would receive greater reimbursements.  *See* [*id.* at 24 ("Of the 35 CCHs with the highest allowed amounts in 2021, 14 hospitals would have their payments reduced by more than 15 percent, and six hospitals would have their payments increased by more than 15 percent.")].

Finally, the 2023 Final Rule did not provide for any transitional payments during its implementation.  Defendants reasoned that "transitions are performed when providers may be exposed to payments that are below their costs," but under the 2023 Final Rule, perpetual hold-harmless payments would ensure reimbursement of CCHs' costs.  [*Id.* at 23].

## IV.     Children's Hospital Colorado

Plaintiff, a not-for-profit health system operating children's hospitals and other clinical locations in Colorado, provides services to a substantial TRICARE population. [Doc. 1 at ¶ 8; Doc. 13 at 5].  In 2022, Children's Hospital Colorado, with facilities in Aurora ("Children's Anschutz") and Colorado Springs ("Children's Colorado Springs") that are adjacent to several military installations, served over 16,000 children covered by TRICARE across more than 50,000 patient visits.  [Doc. 13-1 at ¶¶ 8, 13].

Plaintiff's annual TRICARE payments will be reduced by at least ten million dollars annually under the 2023 Final Rule's new reimbursement system.  *See* [Doc. 13-2 at ¶¶ 17–18 (parties' estimates range between $11.4 million and $17.4 million)].  Plaintiff has submitted declarations—largely in the context of the irreparable-harm analysis required for preliminary injunctive relief—indicating that several of its programs and services will need to be downgraded or eliminated under the 2023 Final Rule.  These include certain emergency services, the Children's Colorado Springs Center for Cancer and Blood Disorders, the Children's Colorado Springs Infusion Center, neonatal intensive care, pediatric trauma care, behavioral health, sleep lab services, epilepsy monitoring, and newborn hearing screening.  *See, e.g.*, [Doc. 13-1 at ¶¶ 18–35].  Plaintiff stresses that the "imminent dismantling of these programs is not something that can be easily reversed, and even if [Plaintiff] were to have the opportunity to reinstate these proposed cuts, it would take years to rebuild [the] programs and staffing levels."  [*Id.* at ¶ 15].  DoD responds that the 2023 Final Rule merely reduces "windfall payments . . . well in excess of the costs that Plaintiff incurs to provide the covered services."  [Doc. 23-1 at 12].

Plaintiff filed this action on September 29, 2023, [Doc. 1], a few days before the 2023 Final Rule went into effect.  Plaintiff brings two claims under the APA.  [*Id.* at ¶¶ 82–94].  Plaintiff moved for preliminary injunctive relief on October 12, 2023.  [Doc. 13].  The Court then ordered the Parties to brief the merits of the dispute and, once the briefing concluded, held oral argument, at which it denied Plaintiff's request for preliminary injunctive relief as moot in light of the pending cross-motions for judgment on the administrative record, which were taken under advisement.[4]  *See* [Doc. 20; Doc. 36]; *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (the "limited purpose" of preliminary injunctions only lasts until a trial on the merits).  The issues are now fully briefed and ripe for decision.

## LEGAL STANDARD

When evaluating a challenge to an agency's interpretation of a statute, a court should first ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  If it has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.  Where Congress has left an ambiguity, courts should defer to the agency's interpretation so long as it is "based on a permissible construction of the statute."  *Id.* at 843.  That is true "even if the agency's reading differs from what the court believes is the best statutory interpretation."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  And,

---

[4] Although the Court has denied Children's Hospital Colorado's Motion for Preliminary Injunction, [Doc. 13], as moot, [Doc. 36], the Court references Plaintiff's brief when evaluating the arguments in Plaintiff's Motion because the Court combined the preliminary injunction briefing with the briefing on the merits, [Doc. 20].

Defendants urge, broad deference to an agency's statutory construction is particularly appropriate in contexts that involve a "complex and highly technical regulatory program" which require "significant expertise and entail the exercise of judgment grounded in policy concerns." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quotation omitted).

Even when they have authority to act, federal administrative agencies must still engage in "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). Accordingly, "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* When reviewing agency action under the APA, a court may set aside a rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B)–(F) (listing additional grounds for vacatur). This standard "is narrow" and "very deferential to the agency." *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020) (quotation omitted). The reviewing court "presume[s] that an agency action is valid unless the party challenging the action proves otherwise," *id.*, and "will 'uphold the agency's action if it has articulated a rational basis for the decision and has considered relevant factors,'" *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1153 (10th Cir. 2019) (quoting *Wolfe v. Barnhart*, 446 F.3d 1096, 1100 (10th Cir. 2006)).

The arbitrary-and-capricious standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action must be set aside if the agency did not "examine the relevant data," did not "articulate a satisfactory explanation for its action," "entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ANALYSIS

Plaintiff argues that the 2023 Final Rule exceeds DoD's statutory authority under 10 U.S.C. § 1079(i) or, in the alternative, constitutes an abuse of DoD's discretion. Respectfully, the Court finds neither contention persuasive.

## I.      Whether the 2023 Final Rule Exceeds Defendants' Statutory Authority

Plaintiff's lead argument is that the 2023 Final Rule falls outside Defendants' authority under 10 U.S.C. § 1079 because it could tend to diminish the amount or quality of medical care which institutions like Plaintiff currently make available to TRICARE patients, thereby conflicting with what Plaintiff views as a freestanding statutory mandate to provide such care.  In other words, Plaintiff argues that DoD would defy a statutory directive undergirding TRICARE—that is, ensuring medical care is available for military dependents—by adopting a payment methodology that would reduce existing payments to Children's for outpatient services because that would lead Children's to cut or reduce separate programs, indirectly funded by those payments, that benefit TRICARE-insured children.  *See, e.g.*, [Doc. 13 at 18 ("Under these provisions, DoD has *no authority* to adopt payment rules that limit access to medical care for military dependents." (emphasis added))].  At oral argument, Plaintiff's counsel referred to this postulated requirement as an "affirmative duty."  Defendants respond that such a constraint on their rulemaking authority is absurd and unsupported; at most, if the statutory text is ambiguous, they

contend that the 2023 Final Rule should be upheld as reasonable.  *See* [Doc. 23-1 at 25–28].

Plaintiff's argument involves the interplay between two statutory subsections.  In subsection (a) of 10 U.S.C. § 1079, Congress has provided that, "[t]o assure that medical care is available for dependents . . . of members of the uniformed services . . . , the Secretary . . . shall contract, under the authority of this section, for medical care for those persons under such insurance, medical service, or health plans as he considers appropriate."  10 U.S.C. § 1079(a).  In subsection (i) of the same statute, Congress has provided that:

> The amount to be paid to a provider of services for services provided under a plan covered by this section shall be determined under joint regulations to be prescribed by the administering Secretaries which provide that the amount of such payments shall be determined *to the extent practicable* in accordance with the same reimbursement rules as apply to payments to providers of services of the same type under [Medicare].

*Id.* § 1079(i)(2) (emphasis added).

Plaintiff would filter all DoD's action under subsection (i)—and, following the argument's logic, likely other statutory grants of authority as well—through a requirement that DoD "assure" the availability of medical care for military dependents under subsection (a).  But the statutory text does not support Plaintiff's desired construction.  That is because Plaintiff does not explain how or why the plain text of subsection (a) works to constrain the reimbursement mandate of subsection (i) and the Secretary's attendant discretion to assess practicability.  *See WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 698 (10th Cir. 2015) (regulatory requirement to "involve the public 'to the extent practicable' plainly affords an agency considerable discretion to decide the extent to which such public involvement is practicable" (cleaned up)).  The two subsections bear

no textual or logical connection to each other, aside from appearing in the same statutory section.  Subsection (a) does not explicitly or implicitly indicate that it is an overriding gloss on other action taken by the Secretary, such as under subsection (i).  And, with respect to constraints, subsection (i) references only the *practicability* of adopting Medicare's reimbursement rules, not their effect on prior reimbursement amounts in relation to a general goal of maximizing hospital services.  Plaintiff's attempt to insert a substantial and indeterminate constraint on the Secretary's ability to adopt reimbursement methods under subsection (i) runs afoul of the statutory text's clear directive that Medicare's rules "shall" be used where practicable.

Respectfully, the introductory language in subsection (a) emphasized by Plaintiff with respect to "assur[ing]" that care is available for military dependents appears to be nothing more than a general policy or purpose statement.  Defendants suggest that, "when Congress passed the Dependents' Medical Care Act containing the instruction to the Secretary to 'assure the availability of medical care' for military dependents, health care was generally provided at military medical treatment facilities run by the uniformed services, meaning there was only limited entitlement to any medical care at civilian hospitals."  *See* [Doc. 23-1 at 26 (quoting 10 U.S.C. § 1079(a))].  Although Plaintiff dismisses this notion as an unfruitful "attempt to invoke originalism," [Doc. 29 at 20], the Court finds the historical background—which Plaintiff does not seem to dispute as a factual matter—instructive to evaluating the plausibility of Plaintiff's ambitious application of § 1079(a) to sustain additional services indirectly funded by outpatient fee reimbursements.  That background confirms that neither the text nor the context supports Plaintiff's approach to the statute.

In any case, Plaintiff's desired construction is untenable.  With no limiting principle or means for reasoned enforcement articulated in the briefing or at oral argument, Plaintiff's approach would invalidate any regulation[5] that has the ultimate effect of reducing reimbursements to a recipient hospital that has been repurposing the funds toward any end that could tend to increase the availability or quality of dependent care. *See* [Doc. 13 at 18 ("Under these provisions, DoD has *no authority* to adopt payment rules that limit access to medical care for military dependents." (emphasis added))].  This case demonstrates part of the problem with implementing that approach, as the 2023 Final Rule is projected to increase payments to several CCHs, which would in turn (presumably) increase their services.  *See* [Doc. 24-3 at 24 ("Of the 35 CCHs with the highest allowed amounts in 2021, 14 hospitals would have their payments reduced by more than 15 percent, and six hospitals would have their payments increased by more than 15 percent.")].  But the TRICARE statute focuses on practicability, not the private-sector consequences of reducing reimbursements in accord with a statutory directive to follow Medicare's rules to the extent practicable.  *See* 10 U.S.C. § 1079(i)(2); *see also, e.g.*, *Conservation L. Found. v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004) ("We think by using the term 'practicable' [in the Magnuson-Stevens Fishery Conservation and Management Act] Congress intended rather to allow for the application of agency expertise and discretion.").  Even if practicability might account for such considerations in the agency's discretion, that does not mean that it must.

---

[5] It is unclear whether Plaintiff's "affirmative duty" argument applies only where DoD deviates from Medicare's rules based on practicability.

The Court declines to hold, as Defendants aptly characterize Plaintiff's argument, that "any rule that could have the ultimate effect of decreasing the medical care available to a TRICARE beneficiary at any civilian hospital exceeds DoD's statutory authority." [Doc. 23-1 at 25].  Not only does Plaintiff lack legal authority for this approach, but the statutory text neither suggests, nor mandates, nor creates ambiguity as to the validity of, such an unreasonable construction.[6]  Defendants may well factor the availability of medical care into a practicability assessment under § 1079(i)(2) in certain circumstances, but doing so would not be required under the statute, nor would it take on dispositive weight, as Plaintiff contends.  Besides, Plaintiff has not suggested that the 2023 Final Rule would diminish or abolish funding for individual TRICARE patient visits or acute care needs—only that it would reduce the discretionary funding otherwise available to fund additional services that benefit TRICARE patients at Plaintiff's facilities.  It is not clear to the Court that § 1079(a) should be read by reference to the latter category.  While the Court recognizes the benefits provided by the additional services allegedly jeopardized by the 2023 Final Rule, it is not the Court's role to determine whether to continue indirectly funding them.  Cf. DHS v. Regents of Univ. of Cal., 140 S. Ct. 1891, 1916 (2020) (in conducting arbitrary-and-capricious review, courts do not pass on whether agency action is "sound polic[y]").  Nor is it the Court's role to displace a reasonable, if debatable, understanding of practicability with the Court's own.  See Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1164 (10th Cir. 2002) ("[T]he court cannot substitute its judgment for that of the agency.").

---

[6] Having adopted Defendants' construction, the Court need not consider Defendants' argument that the title of the relevant provision of the FY02 NDAA indicates that Congress intended to reduce reimbursements to hospitals.  See, e.g., [Doc. 23-1 at 26–27].

In seeking a preliminary injunction, Plaintiff also suggested that Congress has already determined that Medicare's rules for reimbursing children's hospitals are practicable, so DoD could not deviate from them. *See* [Doc. 13 at 19]. Defendants dismiss this contention as improperly focusing on practicability from the perspective of Medicare, rather than TRICARE, and note that it would render the practicability inquiry "meaningless." [Doc. 23-1 at 28–29]. To the extent this argument remains for decision, the Court agrees with Defendants that "the TRICARE statutory framework makes clear that practicability should be assessed from the perspective of the DoD in administering the TRICARE program, not from the perspective of the Centers for Medicare and Medicaid Services in administering Medicare." [*Id.* at 28]; *see also WildEarth Guardians*, 784 F.3d at 698. Moreover, if practicability for TRICARE were determined by reference to Medicare's reimbursement rules, then the statutory practicability requirement would be meaningless, as there would be no basis for ever departing from Medicare. But Congress mandated the adoption of Medicare's rules "to the extent practicable" for TRICARE, 10 U.S.C. § 1079(i)(2), and courts are "obliged to give effect, if possible, to every word Congress used." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29 (2018) (quotation omitted); *see also Env't Def. Fund v. U.S. Nuclear Regul. Comm'n*, 866 F.2d 1263, 1268 (10th Cir. 1989) (reasoning, where statute required defendant agency to follow EPA standards "to the extent practicable," that if defendant agency "had no power to grant a variance from the EPA standards, literal compliance with those standards, rather than compliance 'to the extent practicable,' would be the expected statutory wording"). Accordingly, the Court concludes that the TRICARE statue contemplates

Defendants assessing whether the relevant Medicare rules would be practicable for TRICARE to implement.

Next, Plaintiff argues that the 2023 Final Rule "exceeds DoD's statutory authority because it does not apply the Medicare reimbursement rules for children's hospitals which, when properly interpretated [sic] are practicable." [Doc. 29 at 21]. The argument seems to be that a PCR-based hold-harmless payment grounded in pre–2023 Final Rule TRICARE payments would be a better fit, and practicable, so DoD should have adopted it instead. *See* [*id.* at 21–24]. Defendants respond that DoD's approach in the 2023 Final Rule was based on finding Medicare's methodology impracticable and was within the agency's reasonable discretion. *See* [Doc. 32 at 13–17]; *see also* [*id.* at 13–14 ("Congress did not prohibit TRICARE from adapting Medicare's reimbursement rules to accommodate the fact that TRICARE is a different program administered by a different agency on behalf of a different beneficiary base.")].

Although framed as a challenge to the agency's authority, this argument seems to accept that Defendants may rely on discretionary practicability assessments to limit or curtail their adoption of Medicare's rules, but it disagrees with Defendants' particular determination of practicability in this case. *See, e.g.*, [Doc. 29 at 24 (arguing that "[w]hen the Medicare methodology is looked at properly, it is hard to see how DoD can reasonably argue that such a methodology is not practicable")]. As an organizational matter, this contention is best reviewed, to the extent it can be reviewed at all, in the context of Plaintiff's suggestion that the 2023 Final Rule constitutes arbitrary and capricious rulemaking because DoD did not support its practicability determination. *Compare City of Arlington v. FCC*, 569 U.S. 290, 299 (2013) ("[T]here is *no difference*, insofar as the

validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has."), *with* [Doc. 13 at 20 ("Even if the 2023 Final Rule, as applied to children's hospitals, is not expressly foreclosed by the Military Health Act and the FY02 NDAA, it is still unlawful because it does not reasonably construe those statutes, does not effectuate Congress's intent, and is arbitrary and capricious.")].

Finally, to the extent that Plaintiff argues that the 2023 Final Rule so deviates from Medicare's rules as to violate the statute, this Court respectfully disagrees. *See, e.g.*, [Doc. 34 at 9 ("The problem is that in the 2023 Final Rule, DoD did not simply 'modify' the Medicare reimbursement rules.  It instituted an entirely new reimbursement methodology that bears no resemblance to how Medicare reimburses children's hospitals.  This exceeds the limited discretion Congress granted.")].  Such an argument has no basis in the text of the statute, which simply instructs Defendants to adopt Medicare's rules "to the extent practicable."   10 U.S.C. § 1079(i).   The statutory framing thus contemplates Defendants declining to adopt those rules, to the extent that DoD finds that doing so would be impracticable.  *See WildEarth Guardians*, 784 F.3d at 698; *see also Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1254 (10th Cir. 1998) ("[T]he phrase 'to the maximum extent practicable' imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible." (quotation omitted)).  If Defendants need not adopt Medicare's rules where not practicable, then the modifications they make to those rules in pursuit of practicability do not appear to be constrained, as Plaintiff posits.  Nor can the Court discern the nature of such a constraint from Plaintiff's arguments or authority.  And, even if such a limitation existed, the modifications to Medicare's rules in

the 2023 Final Rule are minimal. This Court is unpersuaded that Defendants have "exceed[ed] the limited discretion Congress granted" by overly departing from Medicare's rules. [Doc. 34 at 9].

## II.    Whether the 2023 Final Rule is Arbitrary and Capricious

Plaintiff proposes several ways in which the 2023 Final Rule, even if it falls within DoD's authority to adopt, runs afoul of the APA upon arbitrary-and-capricious review: (1) DoD failed to adequately explain why Medicare's rules for reimbursing CCHs were impracticable, [Doc. 29 at 24–26]; (2) DoD did not sufficiently explain why it changed its understanding of Medicare's rules after the 2008 Final Rule, [*id.* at 26–27]; (3) DoD failed to adequately address comments made following the 2019 NPRM, [*id.* at 27–30]; and (4) DoD did not adequately consider the 2023 Final Rule's impact on children's hospitals, [*id.* at 30–32].[7]   Defendants disagree, pointing to DoD's discussion of practicability concerns with Medicare's methodology, contending that DoD consistently viewed Medicare's rules as impracticable for TRICARE across its rulemakings, and stressing that the 2023 Final Rule directly addressed concerns raised in comments with respect to the potential impact of the methodology change on certain children's hospitals. *See* [Doc. 32 at 17–24]; *see also* [Doc. 23-1 at 30 ("DoD carefully considered the very issue at the core of Plaintiff's lawsuit—that lower rates would financially harm children's hospitals and

---

[7] Plaintiff also argued in seeking a preliminary injunction that the 2023 Final Rule is arbitrary and capricious because it does not accurately calculate CCHs' costs for reimbursement purposes. *See* [Doc. 13 at 22–24]; *see also* [Doc. 23-1 at 35–36]. However, it does not appear that this argument is discussed at any point in Plaintiff's briefing on the Parties' cross-motions for summary judgment. *See generally* [Doc. 29; Doc. 34]. At oral argument, counsel for Defendants noted that it was unclear whether Plaintiff was still advancing this argument. As Plaintiff did not discuss the argument in response, and as it does not appear in Plaintiff's most recent briefs, the Court finds that it need not be considered.

therefore potentially decrease access to service—both before issuing the notice of proposed rulemaking, and during the rulemaking process." (citations omitted))].  For the reasons that follow, this Court respectfully concludes that the 2023 Final Rule was neither arbitrary nor capricious.[8]

### A.      Explaining Impracticability

Plaintiff contends, and Defendants do not seem to dispute, that "[a]s part of the rule making process, DoD is not permitted to simply declare that following the Medicare methodology for the hold harmless payment is not practicable."  [Doc. 29 at 24].  The issue is how much more DoD must do when it declines to track Medicare precisely, and whether it met that threshold in the 2023 Final Rule.  Plaintiff argues that "DoD did not attempt to explain—let alone reasonably explain—its conclusion that it was not practicable for TRICARE to pay children's hospitals using the same reimbursement rules and at the same frequency as Medicare."  [Doc. 13 at 20].  Plaintiff stresses that DoD was wrong to focus on practicability from its own perspective, as opposed to that of CCHs and TRICARE dependents.  *See* [*id.* at 21].  In response, Defendants focus on the 2023 Final Rule's discussion of the administrative complexities of importing the Medicare rule to a comparatively smaller beneficiary population, as supported by third-party analyses in the Administrative Record.  *See* [Doc. 23-1 at 31–32].  Plaintiff replies that DoD has not

---

[8] At oral argument, Plaintiff's counsel suggested that the Supreme Court's upcoming decision with respect to whether to modify or overrule the *Chevron* doctrine may affect whether the 2023 Final Rule survives arbitrary-and-capricious review.  *Cf.* [Doc. 13 at 4–5 ("The 2023 Final Rule also fails at *Chevron* step two because it is arbitrary and capricious.")].   The Court respectfully agrees with Defendants that, whatever the conceptual overlap between *Chevron* deference and the deference afforded to agencies in the context of ordinary arbitrary-and-capricious review, the Court's assessment of whether the 2023 Final Rule is arbitrary or capricious would be unaffected by a change to *Chevron*'s second step.

explained "how having a smaller beneficiary population than Medicare makes its work more administratively complex, . . . what administrative burdens and complexities existed[,] or why specifically DoD could not follow Medicare's methodology for the hold harmless payment."  [Doc. 29 at 25].

Plaintiff is correct that courts will not "defer to [an] agency's conclusory or unsupported suppositions." *McDonnell Douglas Corp. v. U.S. Dep't of Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).  But the determination of impracticability in the rulemaking process associated with the 2023 Final Rule is hardly conclusory or unsupported.  As previewed in the 2019 NPRM, DoD explained in the 2023 Final Rule that the proposed modifications to Medicare's rules for reimbursing CCHs were "practicable to adopt for TRICARE's comparatively smaller beneficiary population, and addresses issues of administrative complexity which led the agency to exempt CCHs in the original implementation of OPPS."  [Doc. 24-3 at 23]; *see also* [*id.* at 6 (2019 NPRM)].  That reasoned explanation, consistent with Defendants' prior rulemakings, might well be enough in itself.  *See City of Colo. Springs v. Chao*, 587 F. Supp. 2d 1185, 1194 (D. Colo. 2008), *aff'd sub nom. City of Colo. Springs v. Solis*, 589 F.3d 1121 (10th Cir. 2009) ("A terse administrative decision . . . will still pass muster under the arbitrary and capricious standard so long as the agency's reasoning is apparent from the explanation given."); *Barker v. United States*, 404 F. Supp. 3d 251, 264 (D.D.C. 2019) (agency explanation "may be relatively simple and briefly stated" (quotation omitted)).  But that is hardly all.

The Administrative Record in this case discloses several independent reports commissioned by Defendants in the rulemaking process that elaborate upon the

practicability concerns informing the 2023 Final Rule.  For example, an August 1, 2017,

Memorandum prepared by Kennell and Associates, Inc.[9] explains:

> *We do not think it is practicable nor advisable to use the exact Medicare payment levels or method for several reasons.*  First, Medicare's method of monthly reporting and reconciliations would be burdensome and costly for TRICARE, and annual reconciliations are done for comparable TRICARE payment systems (e.g., [Sole Community Hospitals] inpatient and TOPs).  Second, we do not recommend using the exact hospital-specific PCR factors which Medicare uses as they are based on 1996 Medicare cost report data for these hospitals.  These factors would not represent the types of care received by TRICARE patients, and some of their pre-OPPS payment methods are not the same as TRICARE's for these hospitals, being based on cost reports for many services which TRICARE pays as billed.  As a result, the Medicare PCR factors would be inappropriate for TRICARE.  Third, calculating and using a TRICARE hospital-specific PCR for these hospitals from current TRICARE claims, instead of using Medicare's PCR, would be administratively complex and could cause complaints from individual providers who didn't like their results, etc., which would have to be addressed.  More importantly, a base year PCR only represents casemix at that point in time, and does not change if casemix changes; it is likely to be particularly unrepresentative for many of the hospitals without a high volume of TRICARE claims.  Finally, for many hospitals with low TRICARE volumes, the calculation of the PCR would not be valid statistically due to the small number of claims.  It is far simpler, and conceptually fairer and more logical, to simply pay current costs as the alternative to OPPS, rather than using a static base year PCR.  If hospitals are paid based on current CCRs, they are more likely to be paid fairly.  In addition, Medicare's historic PCRs used for their method are all less than 1.0, which means less than the hospital's costs.  We do believe that DHA can adopt a substantially similar method as that used by Medicare.

[Doc. 24-3 at 107–08]; *see also* [*id.* at 107 ("The calculations are quite complex because

they include OPPS outlier payments and transitional pass-through payments for drugs,

biologicals, and certain devices.")].[10]

---

[9] According to the Declaration of Elan P. Green, submitted by Defendants, "Kennell and Associates, Inc. [is] an independent expert specializing in healthcare policy analysis of [f]ederal healthcare programs and private sector organizations, whose research and consulting services were retained by [DoD]."  [Doc. 23-2 at 3 n.2].

[10] At the hearing in this matter, Plaintiff raised concerns with respect to DoD's reliance on what Plaintiff viewed as dated analyses by Kennell and Associates, Inc.  The Court does

To the extent the impracticability discussion in the 2023 Final Rule requires elaboration, the foregoing independent analysis in the Administrative Record provides it. *Cf. Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) ("[A] reviewing court must uphold even a decision of less than ideal clarity if the agency's path may reasonably be discerned." (quotation omitted)).  Defendants had adequate reasoned support for the statements in the 2023 Final Rule that adopting Medicare's reimbursement rules for CCHs without modification would not be practicable for TRICARE.  *See, e.g.*, [Doc. 24-3 at 23 (CCR "still holds the hospital harmless and ensures payment at costs, and is also practicable to adopt for TRICARE's comparatively smaller beneficiary population, and addresses issues of administrative complexity which led the agency to exempt CCHs in the original implementation of OPPS"), 143 ("Allowing the calculation to be made annually reduces the administrative complexity that was the justification for exempting these facilities in the [2008] Final Rule.")].  Contrary to Plaintiff's suggestion, a thorough review of the Administrative Record shows that Defendants "examine[d] the relevant data and articulate[d] a satisfactory explanation for [their] action including a 'rational connection between the facts found and the choice made.'"  *Motor Veh. Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

---

not find these concerns persuasive where the Administrative Record contains memoranda from 2015, 2017, 2018, and 2022, *see* [Doc. 24-3 at 149, 156, 175, 215], and it appears that many of the relevant projections and opinions were updated to account for changes in the underlying data.  To the extent they were not, however, the Court's arbitrary-and-capricious review focuses on whether DoD acted reasonably, not whether every word of every analysis DoD considered was maximally up to date.  And, in any case, the oldest memoranda led right into the 2019 NPRM, which led right into the 2023 Final Rule, as part of a single rulemaking effort.  The Court's deferential review can only lead to the conclusion that the analysis DoD commissioned was sufficiently relevant and reliable to inform a reasonable decisionmaking process.

### B.    Changing Approaches

Plaintiff next argues that DoD "never explains why in 2008 it took the position that the Medicare methodology required TRICARE to hold harmless to TRICARE's own pre-OPPS payment amounts, and now in 2023 it takes a different position."  [Doc. 29 at 26]; *see also* [Doc. 13 at 25–26 (charging Defendants with "unexplained inconsistency and illogical and shifting policies")].  The argument is that Defendants unreasonably changed positions with respect to what adopting Medicare's rules would entail for TRICARE. *Compare* 73 Fed. Reg. at 74,949 (2008 Final Rule:  "TOPs would require a comparison of what would have been paid [i.e., billed charges and CHAMPUS Maximum Allowable Charge (CMAC) amounts] prior to implementation of the OPPS for hospital outpatient services to those amounts actually paid under the OPPS for the same services." (alteration in original)), *with* [Doc. 24-3 at 22–23 (2023 Final Rule:  Medicare "multipl[ies] the provider's payment-to-cost ratio (PCR), based on the provider's base year cost report (generally CY 1996), times the reasonable costs the provider incurred during a calendar year to furnish the services that were paid under the OPPS.")].

The Court respectfully agrees with Defendants that the 2023 Final Rule was materially consistent with the 2008 Final Rule because, in the most recent rulemaking, "DoD did not adopt the form of hold-harmless payments that DoD previously characterized as an unjustifiable administrative burden."  [Doc. 32 at 19]; *see also* [Doc. 23-1 at 38 ("[T]he gradual adoption of Medicare's reimbursement rules for hospital outpatient services is not a departure from DoD's stated policy, but the very implementation of that policy.")].  Nor did DoD adopt OPPS.  Instead, whether based on pre-OPPS payments or prior TRICARE payments, DoD maintained its position that TOPs

would be impracticable to calculate for TRICARE.  *See* 73 Fed. Reg. at 74,949; [Doc. 24-3 at 22–23].  Even if the Court viewed the 2023 Final Rule as a reversal of policy or approach with respect to what Medicare's rules would mean for TRICARE, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see also FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) ("[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."). For the reasons discussed above, Defendants have adequately support the approach taken by the 2023 Final Rule.

## C.  Addressing Comments

Plaintiff also argues that Defendants insufficiently responded to comments submitted by CHA and CHKD with respect to the impact of the rule proposed in the 2019 NPRM on children's hospitals.  [Doc. 29 at 27–30]; *see also* [Doc. 13 at 24–25]. Defendants counter that the 2023 Final Rule's section regarding comments addressed "the precise concern raised by Plaintiff in this action" and acknowledged the alternatives proposed by commenters.  [Doc. 23-1 at 37–38].

"An agency must consider and respond to significant comments received during the period for public comment."  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Both CHA and CHKD submitted comments related to the impact of the 2023 Final Rule on children's hospitals as part of the regulation's notice-and-comment process.  [Doc. 24-3 at 70–74, 94–97].  In the 2023 Final Rule, Defendants addressed these issues under the heading "*Maintain Current Exclusion of CCHs From OPPS*":

> *Comment:*   One commenter stated that the adoption of OPPS reimbursement for CCHs will have an undesirable financial impact on their Children's hospital and other Children's Hospitals that serve large TRICARE populations.   Their concerns include that Medicare payments have been historically below cost, and that changes to the TRICARE fee structure, when combined with Medicare's rates, pose a significant threat to their ability to service military families.   The suggestions ranged from continuing to reimburse Children's Hospitals at billed charges or ''grandfathering'' certain facilities that are in close proximity to military bases that treat a disproportionate share of TRICARE beneficiaries.
>
> *Response:*   DHA agrees that some children's hospitals will have reduced TRICARE payments due to the rule's provisions although DHA's analysis also indicates that some children's hospitals will see large increases in their TRICARE payments.
>
> The proposed rule contained a provision for a General Temporary Military Contingency Payment Adjustment (GTMCPA) which will allow children's hospitals and cancer hospitals that meet certain criteria to receive additional payments for services which will be paid under OPPS.   The criteria will not be based on criteria similar to those specified under TRICARE's OPPS for GTMCPAs.   These criteria, which have been tailored for CCHs, will include:   (1) 10 percent or more of the hospital's revenue is from TRICARE for care of ADSMs/ADDs; (2) the hospital having 10,000 or more TRICARE visits that would fall under the OPPS payment system for ADSMs/ADDs annually; and (3) the hospital being deemed as essential for TRICARE operations.   Hospitals that meet these criteria will be eligible to receive up to 115 percent of the hospital's costs for OPPS services.   These provisions can be implemented for children's hospitals without jeopardizing access for TRICARE beneficiaries, because of the ability of children's hospitals to apply for a GTMCPA.

[Doc. 24-3 at 16].   The Court finds that this discussion demonstrates sufficient consideration of the comments respecting children's hospitals received in the rulemaking process because DoD addressed the suggestion that the 2023 Final Rule would harm children's hospitals' "ability to service military families."   [*Id.*]; *see also Heal Utah v. EPA*, 77 F.4th 1275, 1293 (10th Cir. 2023) (considering whether agency "rationally explained its basis for disagreeing with the comments").[11]   Accordingly, the Court respectfully

---

[11] Plaintiff questions the effectiveness of GTMCPAs in practice, *see* [Doc. 29 at 29–30], but their efficacy has no bearing on whether DoD rationally engaged with the comments at issue for purposes of reasonableness review.   As Defendant observes, "Plaintiff may disagree that these modified eligibility criteria are sufficient for GTMCPAs to accomplish

disagrees with Plaintiff's suggestion that the 2023 Final Rule does not provide adequate engagement with commenters' concerns.  *See* [Doc. 29 at 29].  To the extent that the notice-and-comment process raised other concerns related to children's hospitals, *see, e.g.*, [Doc. 24-3 at 73], Plaintiff concedes in its briefing that "DoD 'need not address every comment' made during the notice and comment period."  [Doc. 29 at 27–28 (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003))].

### D.    Considering the Impact

Finally, Plaintiff argues that DoD did not adequately consider the impact of the 2023 Final Rule on children's hospitals during the rulemaking process because it "failed to analyze the data properly."  [*Id.* at 30–32].  Plaintiff suggests that DoD insufficiently or inaccurately accounted for the financial impact of the rule on discrete hospitals.  [*Id.* at 31–32].  Defendants respond that practicability is assessed from DoD's perspective, not that of children's hospitals.  *See* [Doc. 23-1 at 32–33 ("[T]he TRICARE program creates an entitlement to coverage for medical services for TRICARE beneficiaries, not an entitlement to payment for providers.")].  In any case, Defendants contend that they thoroughly considered the effect of the 2023 Final Rule on CCHs, pointing to the agency's discussion of the financial impact on CCHs and the addition of GTMCPAs tailored for CCHs.  *See* [*id.* at 33–34].

Respectfully, it is not evident that § 1079(i)(2) requires DoD to assess practicability from the vantage point of individual children's hospitals when modifying Medicare's rules. *See WildEarth Guardians*, 784 F.3d at 698 (referencing agency's "considerable

---

their goal, but this is not a case in which the agency failed to respond to the substance of concerns raised in comments."  [Doc. 32 at 22].

discretion" to assess practicability where statutory text imposed duty "to the extent practicable"). Even if Defendants were required to account for the impact of the 2023 Final Rule on children's hospitals after they determined that Medicare's rule was impracticable, however, the Court finds no support for the contention that DoD failed to do so. *See, e.g.*, [Doc. 24-3 at 16 ("DHA agrees that some children's hospitals will have reduced TRICARE payments due to the rule's provisions although DHA's analysis also indicates that some children's hospitals will see large increases in their TRICARE payments.")]. The Administrative Record reflects that Defendants "reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423.

The notion that Defendants improperly analyzed the 2023 Final Rule's precise impact is of little weight where Defendants specifically forecasted that some children's hospitals—including Children's Anschutz—would receive significantly reduced reimbursements under the 2023 Final Rule, and considered that as part of the rulemaking process. *See, e.g.*, [Doc. 24-3 at 115 ("One important finding is that the two largest TRICARE hospitals would have substantial reductions in their payments under the proposed method.")]; *see also* [*id.* at 24 ("Of the 35 CCHs with the highest allowed amounts in 2021, 14 hospitals would have their payments reduced by more than 15 percent, and six hospitals would have their payments increased by more than 15 percent.")]. And Plaintiff provides no authority for the proposition that the Court may revisit DoD's reasoned analysis of the regulatory landscape at such depth. *Cf. N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1167 (10th Cir. 2019) ("Courts cannot second guess an agency's rulemaking decision when it provided reasons

for its chosen course of action." (cleaned up)); *Rocky Mountain Peace & Justice Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1155 (10th Cir. 2022) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." (quotation omitted)).

* * *

Upon review of the Administrative Record and the Parties' arguments, this Court respectfully concludes that Plaintiff cannot overcome the "presumption of regularity," *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011), that the 2023 Final Rule receives.  As Defendants observe, "Congress authorized DoD to modify Medicare's reimbursement rules to accommodate concerns for administrative burden and practicability," [Doc. 32 at 7], and that is precisely what DoD did here.  Although Defendants may well have viewed the evidence before them differently, the law did not require them to do so, and Defendants specifically contemplated the impact of the 2023 Final Rule on children's hospitals like (and including) Plaintiff.  Plaintiff's disagreement with the substance of Defendants' rulemaking does not allow its challenge to a reasonable exercise of delegated discretion to succeed.  *Cf. Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1063 (10th Cir. 2023) ("Reasonable minds may differ on the desirability of proceeding with the decision despite these costs, but that is not enough to show that [the agency] failed to *consider* an important aspect of the problem or the relevant factors." (quotation omitted)).  Plaintiff has failed to meet its burden to show that DoD acted outside its authority and discretion under 10 U.S.C. § 1079 or engaged in

arbitrary, capricious, or unreasoned rulemaking when it issued the 2023 Final Rule.[12]  *See Defs. of Wildlife v. U.S. Forest Serv.*, 94 F.4th 1210, 1220 (10th Cir. 2024).  Judgment for Defendants is warranted.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1)     Defendants' Motion for Judgment on the Administrative Record [Doc. 23] is **GRANTED**;

(2)     Children's Hospital Colorado's Cross-Motion for Judgment on the Administrative Record [Doc. 29] is **DENIED**;

(3)     Judgment shall enter in Defendants' favor on all counts of the [Doc. 1] Complaint for Declaratory and Injunctive Relief;

(4)     Defendants are awarded their costs pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure and D.C.COLO.LCivR 54.1; and

(5)     The Clerk of Court is directed to close this case.

DATED:  April 17, 2024                              BY THE COURT:

                                                    Nina Y. Wang
                                                    United States District Judge

---

[12] Because the Court does not find in Plaintiff's favor, it need not reach the additional issues briefed and argued by the Parties with respect to the scope of relief under the APA. *See, e.g.*, [Doc. 23-1 at 43].